STATE of Tennessee, Appellee,

v.

Fredrick SCHIMPF, Appellant.

Court of Criminal Appeals of Tennessee, At Knoxville.

March 23, 1989.

Permission to Appeal Denied by Supreme Court Jan. 2, 1990.

Charles W. Burson, Atty. Gen., James W. Milam, Asst. Atty. Gen., Berkley Bell, Dist. Atty. Gen., and Sharon Selby, Asst. Dist. Atty. Gen., for appellee.

Robert W. Ritchie, Charles W.B. Fels, and David M. Eldridge, Knoxville, for appellant.

## OPINION

BIRCH, Judge.

Fredrick Schimpf, the defendant, appeals by right from a conviction of aggravated sexual battery. He is serving a Range II twenty-year sentence.

Defendant's more significant issues include an attack upon the constitutionality of the statute under which he was convicted, and the insistence that the trial judge erroneously admitted certain expert testimony. In eight additional issues, the defendant contends that

1. The presentment fails to provide sufficient information for the preparation of a defense;

2. The presentment should have been dismissed for failure of the Department of Human Services to videotape an interview with the victim;

3. The trial judge should have allowed defendant to inspect a witness' investigative file;

4. The trial judge erroneously admitted certain statements as "fresh complaints";

5. The trial judge erroneously admitted evidence of certain other offenses;

6. The state's summation was improper and should have entitled him to a mistrial;

7. The trial judge should have instructed the jury of the necessity that the victim's testimony be corroborated;

and

8. The sentencing structure is unconstitutional as applied to him.

We have carefully considered each of the defendant's issues; we have determined that the issue concerning the admission of expert testimony is meritorious, with the result that the defendant must have a new trial. Because of this disposition, we will limit our discussion of remaining issues to those which we think are intrinsic or likely to reoccur upon retrial. As to matters involving discovery, the material remains available, and the trial judge will then have another opportunity to consider these discovery matters should request be made. We have also left the issues involving evidence of other offenses, fresh complaint, argument, and sentencing undiscussed be-

cause we think that they are not likely to reoccur.

## THE FACTS

The defendant does not contest the sufficiency of the convicting evidence, except insofar as the sufficiency question inheres in his corroboration issue. It is, nevertheless, helpful that we summarize the facts as of record which we have found necessary for our proper review.

While the five-year-old victim, "T.," [1] and his cousin, "G.," were playing hide-and-seek in their grandmother's basement, Schimpf entered the room, laid on the couch, and showed the victim his "private." Schimpf then took the victim behind the bar and performed fellatio upon him. Schimpf told him not to tell anyone what had occurred.

"G.," still playing hide-and-seek, was hiding under a table; defendant was unaware of his presence in the room.

"G." testified at trial that from where he was hiding, he could not see defendant and "T."; however, he heard them talking and heard "T." giggle.

After defendant left the room, "T." told "G." that Schimpf had "sucked my private" and not to tell anyone.

The victim's mother received a phone call from her sister-in-law informing her that the victim had said "something to his cousin ["L."] about kissing down there." When the mother asked the victim about the statement, he began crying and stated, "Mama, Rick [Schimpf] told me not to tell."

The victim's mother reported her suspicion that Schimpf had sexual contact with her son to the sheriff's department. A child protection investigative team was sent to the home, where they interviewed "T." outside of his mother's presence. The interview was taped with audio equipment. During this interview, "T." used anatomically-correct dolls to show what happened. After the interview, the team advised the mother to have the victim evaluated by a child psychologist. She took the victim to see Dr. Abraham Brietstein, whose testimony we will detail as we resolve the issue of its admissibility.

The victim related three incidents [2] wherein the defendant had sexually abused him, first to his mother, and then to the members of the child protection team. At trial, he used anatomically-accurate dolls to explain his testimony.

The defendant denied under oath that he had sexually abused the victim. He presented witnesses who had been with the defendant and the victim together. They testified that they observed no conduct of a sexual nature. The defendant also presented proof of good character.

Ralph Charles Underwager, Ph.D., a clinical psychologist who has been involved in the study of child sexual abuse for many years, testified on defendant's behalf. He pointed out the fundamental disagreement which he said exists among those in the scientific community concerning Dr. Brietstein's courtroom application of the child sexual abuse syndrome.

## UNCONSTITUTIONALITY OF THE AGGRAVATED SEXUAL BATTERY STATUTE

■ The defendant attacks the two statutes which together constitute the prohibition against aggravated sexual battery:

Tenn.Code Ann. § 39–2–606(a) defines aggravated sexual battery as *unlawful* sexual contact (emphasis supplied);

and

Tenn.Code Ann. § 39–2–602(10) defines sexual contact as intentional touching ... if that intentional touching can *reasonably* be construed as being for the purpose of sexual arousal or gratification (emphasis supplied).

The defendant insists that the statutes are constitutionally defective in two particulars: first, because the statute does not

---

1. Consistent with our policy, we will withhold the identity of young children involved in sexual abuse.

2. The defendant was convicted of only one of the three counts.

include definitions of the terms "unlawful" and "reasonably"; and second, because the statute fails to designate the intended recipient of the sexual arousal or gratification produced by the prohibited conduct. He asserts, therefore, that the definition of aggravated sexual battery is so vague and overbroad that it violates the due process clauses of our federal and state constitutions. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 8.

Generally, in order for a statute to meet constitutional requirements, its provisions must be clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Penal statutes, however, are more closely scrutinized, and a penal statute must be sufficiently explicit and clear to inform those who are subject to it what conduct on their part will render them liable to its penalties. *Roberts v. Clement*, 252 F.Supp. 835, 843–44 (E.D.Tenn.1966) (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). Due process requires that the law give sufficient warning so that people may avoid conduct which is forbidden. *Rose v. Locke*, 423 U.S. 48, 50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975). Absolute precision in drafting prohibitory legislation is not required since prosecution could then easily be evaded by schemes and devices. *State v. Netto*, 486 S.W.2d 725, 728 (Tenn.1972). Further, "[t]he use of common experience as a glossary is necessary to meet the practical demands of legislation." *Id.* at 729–30 (quoting *Sproles v. Binford*, 286 U.S. 374, 393, 52 S.Ct. 581, 587, 76 L.Ed. 1167 (1932)).

Mr. Justice Cooper, in discussing constitutional vagueness, in the case of *State v. Wilkins*, 655 S.W.2d 914, 915 (Tenn.1983) (quoting *Rose*, 423 U.S. at 50, 96 S.Ct. at 244), stated that:

> [t]he due process prohibition "does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness for '[i]n most English words and phrases there lurk uncertainties.... Even trained lawyers may find it necessary to

consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what statutes may compel or forbid."

We think that acceptance of the defendant's contentions would pull us away from a natural and ordinary interpretation of the statutes and force us to accept one which is strained and limited. We need not cite authority for the undefined use of the words "unlawful" and "reasonably" throughout the law. Plainly, the statutes are clear without the inclusion of the definitions of "unlawful" and "reasonably."

Furthermore, with respect to vagueness, in our opinion, it makes no difference which person is intended to be aroused or gratified. Although the conduct may vary, the result is the same. Simply stated, we hold that under the facts of this case, unlawful sexual contact was complete upon the defendant's intentional touching of the victim, whether for sexual arousal or gratification of himself, or of the victim, or of both.

We hold, therefore, that the language complained of, read in the context of both statutes, provides clear warning of the prohibited conduct and sufficiently delineates boundaries so that a person may determine upon which side of the line his acts fall. *See United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954); *State v. Thomas*, 635 S.W.2d 114, 116 (Tenn.1982); *State v. Pender*, 687 S.W.2d 714, 718 (Tenn.Crim.App.1984), *p.t.a. denied* March 4, 1985.

## THE ADMISSIBILITY OF EXPERT TESTIMONY COMPARING CERTAIN SYMPTOMS EXHIBITED BY THE VICTIM WITH A COMBINATION OF SYMPTOMS THOUGHT TO BE TYPICAL AMONG CHILD VICTIMS OF SEXUAL ABUSE

Following a pre-trial offer of proof, the trial judge overruled defendant's objection to the testimony of Dr. Abraham Brietstein; he was permitted to testify at trial. Dr. Brietstein, who was awarded the Ph.D. degree from Florida Institute of Technolo-

gy, claims expertness in the evaluation and treatment of sexually-abused children. He first conducted a clinical interview with "T." and later administered the Children's Apperception Test and the House–Tree–Person test. In his words, "I make some kind of determination using what I refer to as differentiating criteria as to whether this case is similar to other cases of child sexual abuse." Dr. Brietstein defines "differentiating criteria" as "certain signs and symptoms and characteristics that are typical of children who have been sexually abused, just like a physician who does an exam of a child who has a cold, looks into their throat and sees whether the throat is red, looks in the ears, thumps on the chest." He continues, "I basically review all the data that I've gotten from the child, all the things he's told me and I look for certain signs and symptoms and if those signs are present then I make a conclusion that this case is similar to other cases of child sexual abuse."

More succinctly stated, child sexual abuse syndrome refers to that group of signs and symptoms thought to be part of the post-incident experience of child victims of sexual abuse. This issue has only recently received attention in state courts, and the principles governing the admission of such testimony are therefore still evolving. Its use to establish the occurrence of sexual abuse upon a child is a most perplexing issue and one not before decided in Tennessee.

This question has made its way to the highest courts of other states, but seldom has it been presented in precisely the same context. Differences from state to state with regard to scope of review and evidentiary requirements make it most difficult to tally those states "for" and those states "against." Nevertheless, we do consider the holdings of the Supreme Courts of our sister states of Kentucky and Missouri to be significant, albeit neither holding offers perfect guidance.

The Kentucky Supreme Court in *Bussey v. Commonwealth*, 697 S.W.2d 139 (Ky. 1985), addressed the admission of a psychiatrist's testimony as to "child sexual abuse accommodation syndrome" in a sodomy trial where the victim was the eleven-year-old daughter of the defendant. In *Bussey*, a psychiatrist testified for the prosecution that in his opinion, the victim exhibited symptoms of what he termed the "relatively new" concept of child sexual abuse accommodation syndrome. This term, according to the psychiatrist, is used to describe a number of symptoms which can be recognized in children who have been sexually abused by someone to whom they are closely related, and includes, among other things, a tendency to be secretive, frightened, and to experience a great deal of guilt. The Court held this evidence inadmissible because the psychiatrist was unable to make any direct link between the alleged abuse and the symptoms manifested by the victim.[3] Finding the evidence immaterial, the Court did not decide the broader issue, but parenthetically noted the absence of proof that the child sexual abuse accommodation syndrome had been generally accepted in the medical community.

In *State v. Taylor*, 663 S.W.2d 235 (Mo. banc 1984), the trial issue was whether the sexual activity was consensual; the appellate issue was whether evidence that the victim of the alleged rape had suffered from rape trauma syndrome was admissible to prove that intercourse had not been consensual. In reversing the trial judge's admission of the evidence, the Missouri Supreme Court sitting *en banc* held that the psychiatrist's opinion went too far because it improperly characterized the syndrome as a consequence of the sexual activity. As Judge Gunn wrote for the Court,

> [t]hat conclusion vouches too much for the victim's credibility and supplies verisimilitude for her on the critical issue of whether defendant did rape her. That was not part of Dr. Amanat's evaluation process. For, indeed, according to Dr.

---

3. There was also evidence in *Bussey*, 697 S.W.2d at 141, that the victim had been abused by others as well as by the defendant.

Amanat, trauma syndrome could result from a number of stressful situations, and it would be too presumptious [sic] for him to designate the particular experience. This was not his proper function. *Id.* at 240.

At the outset, we are mindful of our narrow scope of review, for in the decision to admit or exclude expert testimony, the trial judge has broad discretion. We will not disturb the exercise of this discretion so long as it is not exercised arbitrarily. *Baggett v. State*, 220 Tenn. 592, 598, 421 S.W.2d 629, 632 (1967); *Fortune v. State*, 197 Tenn. 691, 697, 277 S.W.2d 381, 384 (1955). But on the other hand, unquestioned acceptance is neither required nor expected. *See Pruitt v. State*, 216 Tenn. 686, 692, 393 S.W.2d 747, 751 (1965).

Most jurisdictions have stringent requirements which must be met before an expert witness is allowed to use certain scientific tests or techniques as the primary basis for an opinion. In excluding expert testimony involving voice identification, the Court in the case of *United States v. Brown*, 557 F.2d 541, 556 (6th Cir.1977), stated

[a] courtroom is not a research laboratory. The fate of a defendant in a criminal prosecution should not hang on his ability to successfully rebut scientific evidence which bears an "aura of special reliability" and "trustworthiness," although, in reality the witness is testifying on the basis of an unproved hypothesis in an isolated experiment which has yet to gain general acceptance in its field.

And in the case of *United States v. Baller*, 519 F.2d 463, 466 (4th Cir.1975), *cert. denied* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975), the Court stated

[t]here are good reasons why not every ostensibly scientific technique should be recognized as the basis for expert testimony. Because of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact. In addition, it is difficult to rebut such an opinion except by other experts or by cross-examination based on a thorough acquaintance with the underlying principles. In order to prevent deception or mistake and to allow the possibility of effective response, there must be a demonstrable, objective procedure for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by which it was reached, drawing their own conclusions from the underlying facts.

The threshold requirements do, of course, vary in specifics from jurisdiction to jurisdiction, but our Supreme Court, in *State v. Williams*, 657 S.W.2d 405 (Tenn. 1983), a case involving the admissibility of testimony concerning hair sample comparison, adopted the four-prong threshold test as articulated in *Brown*, 557 F.2d at 556, and as approved in *United States v. Brady*, 595 F.2d 359, 362 (6th Cir.1979), *cert. denied* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979). Thus, four factors must appear in the record to uphold the admission of expert testimony of a scientific nature:

1. The witness must be an expert;
2. The subject matter of the witness' testimony must be proper;
3. The subject matter must conform to a generally-accepted explanatory theory;

and

4. The probative value of the witness' testimony must outweigh its prejudicial effect.

*Williams*, 657 S.W.2d at 412–13.

While we agree with the state's contention that the child sexual abuse syndrome as articulated by Dr. Brietstein is not a "test" in the strictest sense, it is, nevertheless, a scientific technique over which hangs an "aura of special reliability and trustworthiness." *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir.1973). Its admissibility, therefore, must be tested at the threshold. It was simply not enough to pitch the two experts into the ring and preside over the battle, with the jury decision being awarded to the expert able to engender more credibility.

As to the initial *Williams* requirement regarding the expertness of the witness,

the record indicates that Dr. Brietstein obtained much of his formal education and clinical experience in institutions or facilities which then lacked approval of the American Psychological Association. The trial judge found him to be an expert. Since the trial judge observed the witness in the courtroom setting, we will not disturb this finding.

We turn to the second prong of admissibility—that the subject matter of the witness' testimony be proper. We think that to be deemed proper in the sense of this requirement, the evidence must address a proper issue; the jury must need assistance to resolve that issue; and the evidence must substantially assist the jury in its resolution of that issue.

Several general principles of admissibility appear throughout our case law concerning expert testimony, and they are helpful in our subject matter analysis. They include the principles that the evidence must not invade the province of the jury;[4] that the evidence should never be admitted unless it is clear that the jurors themselves are incapable, for want of experience or knowledge on the subject, to draw correct conclusions from the facts proved;[5] that the evidence should neither mislead nor confuse the jury;[6] and most importantly, the evidence should not relate to credibility of witnesses.[7]

As aforestated, Dr. Brietstein observed and tested the victim. He looked for manifestations of certain conduct and for certain responses to questions which he thought would be forthcoming from the "typical" victim of child sexual abuse.

In order to determine whether Dr. Brietstein's testimony passes the subject matter test, it is vital that we examine in detail his conclusions and the facts upon which they rest. These facts and conclusions, to which we have supplied emphasis, are quoted from the transcript verbatim and are in Dr. Brietstein's words as follows:

1. *CONSISTENCY*

The first thing and perhaps the foremost is the description that he gave was *consistent* with the description that had previously been told ... [c]hildren who exhibit symptoms of child sexual abuse are *consistent* from one time to the next, relatively *consistent.* They don't change their story dramatically. Children who have not been sexually abused tend to change their story from one time to the next. They tend to be *inconsistent. So the fact that he was consistent was deemed significant.*

2. *DETAILS*

Children who allege sexual abuse but are unable to provide clear details and are just very vague, very sketchy, those are the ones who tend to be the most questionable. *Children who have been sexually abused are able to provide clear details about it.*

3. *LANGUAGE*

If a child uses the language that a child typically uses then this is more typical of child sexual abuse. If a child uses adult language and an example of that might be "he molested me. He sexually abused me." That's an adult language. When a child uses that kind of language I tend to think they have been coached. When a child says things like, "It tickled and I was scared." That's not the language of an adult. That's the language a child uses. ["T." used] a child's kind of language.

4. *CORROBORATION*

The fourth differentiating criteria has to do with wehther [sic] the details that the

---

4. *See e.g. Bryant v. State,* 539 S.W.2d 816, 819 (Tenn.Crim.App.1976), *cert. denied* July 26, 1976.

5. *See e.g. State v. Atkins,* 681 S.W.2d 571, 576 (Tenn.Crim.App.1984), *cert. denied* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) (quoting *City of Columbia v. C.F.W. Const. Co.,* 557 S.W.2d 734, 741–42 (Tenn.1977)); *State v. Howse,* 634 S.W.2d 652, 656 (1982), *p.t.a. denied* June 1, 1982.

6. *See e.g. State v. Johnson,* 717 S.W.2d 298, 303 (Tenn.Crim.App.1980), *p.t.a. denied* September 8, 1986 (citing *United States v. Downing,* 753 F.2d 1224, 1237 (3rd Cir.1985)).

7. *See e.g. Sparkman v. State,* 469 S.W.2d 692, 698 (Tenn.Crim.App.1970), *cert. denied* September 8, 1970.

child gives can be *corroborated.* The details, can someone else *verify* that the child was present with the person who he says did this at the time that he says he did it. In this case the child said that he was present with the person that he said did it on four different occasions. In fact, this can be corroborated by the child's mother, as well as by another child on one occasion. *This tends to be more consistent with children who have been sexually abused.*

5. *SECRECY*

Children who have been sexually abused are generally told that they need to keep this a secret.... In cases where it has not really happened those elements of secrecy are not present. When they are present it tends to *conform* more to the pattern of child sexual abuse. In this case ["T."] said that Rick, the person who he said did it, told him not to tell. *This is indicative of secrecy, and that is what tends to conform to child sexual abuse.*

6. *MULTIPLE INCIDENTS*

Another typical characteristic is whether there are multiple incidents over time. Children who are sexually abused if they have had contact with the person on more than one occasion, it tends to have happened on more than one occasion.... In this particular case ["T."] said that it happened four different times and that there were at least four different incidents where ["T."] was present with this person. *That conforms to the pattern of child sexual abuse.*

7. *TRAUMA LEVEL*

Another thing that we gauge is what we refer to as the level of trauma. By level of trauma I mean how badly has this child been damaged by this.... So all those factors would point in this case to the expectation that ["T.'s"] reaction is not going to be a terribly traumatic one.... ["T."] does not exhibit a great deal of emotional scars, *so that tends to conform to this pattern.*

8. *SHOW AND TELL*

Another distinguishing characteristic is whether the child can not only tell what happened but can show it.... ["T."] was able to demonstrate with the anatomical dolls what took place, that kids who say they have been abused but don't appear to have been can't demonstrate it. They just say it happened and that's it, but they can't show you how it happened.

9. *ANGER*

Another distinguishing characteristic is whether the child exhibits anger toward the person who did this.... The emotion that he displayed when talking about it, at least when he was in my office, and this was early on, soon after this took place, was appropriate.... *That kind of emotion is appropriate for what you would expect of a child that this happened to.*

10. *SUGGESTIBILITY*

... does the child seem to want to add details to please the person that he's telling.... In this case that didn't appear to be the case.

11. *MOTIVE*

I guess the final thing is whether the child seems to have any motive to lie about it. Is there any great motive for the child to be making this up? If there is, the child's story tends to be less believable, tends not to conform to the pattern of child sexual abuse.... In this particular case there really is no motive for this child to be making this up. *There is basically no motive to lie, which tends also to add to the believability of the child.*

12. *CONCLUSION*

My conclusion was that this particular case did *conform* to a *pattern* of child sexual abuse. It was similar to other cases that I've seen in child sexual abuse.

We think that Dr. Brietstein's testimony clearly confirmed that "T." had, in fact, been sexually abused. Our only difficulty with this is that he confirmed it for a jury deciding defendant's guilt or innocence rather than for a psychologist deciding how to treat a victim.

■ We find that Dr. Brietstein's testimony invaded the jury's province by offering testimony which ultimately went to

credibility. Credibility of witnesses is a matter only for the jury.

Furthermore, the jurors had no need for his testimony. We daily submit to juries the question of whether unlawful sexual activity has occurred. They routinely return verdicts without the assistance of expert psychological testimony. Couched in scientific terms as it was, it could only have confused and misled them.

We conclude that this evidence does not satisfy the *Williams* requirement that the subject matter be proper. Its admission was error.

With respect to the *Williams* requirement that the subject matter must conform to a generally-accepted explanatory theory, the defendant urges us to apply the *Frye* test, contending that its application would result in finding the evidence in question inadmissible. *See Frye v. United States*, 293 F. 1013 (1923). *Frye* articulated the necessary predicate for the admission of expert testimony based on an ostensible scientific principle. That predicate requires threshold proof that the principle upon which the testimony is based "must be sufficiently established to have gained general acceptance in the particular field to which it belongs." *Id.* at 1014.

We do not think the admissibility of the expert testimony in this case depends upon application of the *Frye* rule; first, because the modern trend, expressed in the Federal Rules of Evidence, is away from the *Frye* test. Rule 702, Federal Rules of Evidence, provides for the admission of evidence which "will assist the trier of fact to understand the evidence or to determine a fact in issue...." Rule 703, Federal Rules of Evidence, requires that the data or facts be "of a type reasonably relied upon by experts in the particular field...." *See State v. Johnson*, 717 S.W.2d 298, 303 (Tenn.Crim.App.1986), *p.t.a. denied* September 8, 1986. And second, because in our opinion, the third prong of the *Williams* test [8] represents Tennessee's equivalent of the *Frye* test. We mention

parenthetically that the proposed Tennessee Rules of Evidence incorporates Rule 702 of the Federal Rules of Evidence, with the exception that the proposed Rule 702 requires that the evidence "substantially assist" the trier of fact, while Rule 702 requires merely that the evidence "assist."

In light of the findings we have already made, we think it unnecessary to decide whether the evidence under discussion is based upon a generally-accepted explanatory theory.

We do, however, think it helpful simply to list some of the questions raised by those in the particular scientific community from which this syndrome arose, as we have gleaned from our examination of many cases and much literature. Of course, the trial judge did not have the benefit of all the material that we have had, but we have found much disagreement in the scientific community concerning the use of this type of evidence.

Among those questions raised in the psychological-psychiatric community are:

1. If there is a control group, what criteria is used to determine whether a child in that group has been, in fact, sexually abused?

2. Do children react in similar ways to sexual abuse?

3. Do older children react differently to sexual abuse than do younger children?

4. Is there a typical reaction, or a typical set of reactions manifested by child victims of sexual abuse?

5. Must a child victim react typically to be believed?

6. Was the syndrome developed on the assumption that the children studied were in fact molested?

7. Can the syndrome, developed as a therapeutic aid, be used as a truth-seeking device?

8. Is the syndrome described in DMS III? [9]

---

8. The subject matter must conform to a generally-accepted explanatory theory.

9. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1980).

9. Is the symptomology, when described by different experts and manifested by different victims, precise?

10. Have the symptoms of those children known to be sexually abused been compared to those of children known not to have been sexually abused?

11. Do reactions of children to sexual abuse vary according to the child's relationship to the perpetrator?

12. Is there agreement in the community as to which combinations of symptoms comprise the syndrome? How many? Which ones?

In determining the probative value of this evidence so as to balance it against the prejudicial effect, we find that this was an exceptionally close case. No medical testimony corroborative of the trauma was introduced. The incident was alleged to have occurred some seven months prior to having been reported. There were no witnesses other than the victim. The defendant vigorously denied the accusation and offered proof of good character.

It was assuredly to the state's advantage to buttress the victim's testimony. This it accomplished with Dr. Brietstein. We think his testimony was of immeasurable probative value. Its effect on the defendant's presumption of innocence was devastating, and the damage was irreparable, despite the countervailing testimony of Dr. Underwager, the defendant's expert, who had never interviewed or tested the victim.

■ We certainly do not envy the position of the trial judge as he attempted to balance the need for this testimony against its negative possibilities. Such a determination would seem to require a crystal ball. But as we view it in retrospect, we conclude that the probative value of this testimony was substantially outweighed by the danger that it unfairly prejudiced, confused, or misled the jury.

To reiterate, we conclude that it was an abuse of discretion to admit Dr. Brietstein's testimony. Its prejudicial effect greatly outweighed its probative value. The admission of his testimony, in our opinion, so substantially affected the result of the trial as to constitute reversible error. *See* Tennessee Rules of Appellate Procedure 36(b); Tenn.R.Crim.P. 52(a).

## FAILURE TO DISMISS PRESENTMENT AS INADEQUATE

The defendant asserts that he was entitled to more information than was contained in the indictment concerning time, date, and location of the alleged offenses. For this reason, he requested a bill of particulars. The record before us contains a bill of particulars which indicates a filing date of October 28, 1987. The record further indicates that the pleading was transmitted to defendant's lawyer.

We fail to find in the record any pleading or oral motion by which the defendant sought to bring his dissatisfaction with the bill of particulars to the attention of the trial judge. The trial judge cannot be held in error for matters upon which he had no opportunity to rule. *State v. Newsome,* 744 S.W.2d 911, 918 (Tenn.Crim.App.1987), *p.t.a. denied* December 28, 1987; *Ellison v. State,* 549 S.W.2d 691, 694 (Tenn.Crim. App.1976), *cert. denied* March 14, 1977.

## FAILURE OF DEPARTMENT OF HUMAN SERVICES TO VIDEOTAPE SECOND INTERVIEW

■ In another issue, the defendant maintains that personnel employed by the Department of Human Services should have preserved the second interview with the victim on videotape, as is required by its internal rules. He asserts that failure to preserve this evidence prevented him from preparing an adequate defense and thus should require dismissal of the presentment.

We are not convinced that the so-called "D.H.S. Regulations Bulletin, No. 80 55–85–25, Appendix J" has the force of statute. In any event, inasmuch as a transcript of this interview was furnished to the defendant, we are unable to understand why he considers himself prejudiced by the absence of a videotape.

This issue is without merit.

## CORROBORATION OF VICTIM'S TESTIMONY

The defendant tendered to the trial judge a requested special instruction regarding the necessity that an accomplice's testimony be corroborated. The trial judge denied the requested instruction.

■■■ We agree with the defendant that our law will not support a conviction based upon the uncorroborated testimony of an accomplice-witness. *See State v. Hensley,* 656 S.W.2d 410, 412 (Tenn.Crim.App.1983), *p.t.a. denied* August 29, 1983; *Williams v. State,* 216 Tenn. 89, 101, 390 S.W.2d 234, 240 (1965) (on petition to rehear), *cert. denied* 382 U.S. 961, 86 S.Ct. 444, 15 L.Ed.2d 364 (1965). We also agree with defendant's position that a child, even though legally incapable of consenting to a crime, may nevertheless be an accomplice, thus necessitating corroboration of his testimony. *See Boulton v. State,* 214 Tenn. 94, 98, 377 S.W.2d 936, 938 (1964); *Scott v. State,* 207 Tenn. 151, 155, 338 S.W.2d 581, 583 (1960); *Sherrill v. State,* 204 Tenn. 427, 432–37, 321 S.W.2d 811, 814–16 (1959); *Vermilye v. State,* 584 S.W.2d 226, 230–31 (Tenn.Crim.App.1979), *cert. denied* July 2, 1979; *Henley v. State,* 489 S.W.2d 53, 55–6 (Tenn.Crim.App.1972), *cert. denied* December 4, 1972.

But the question of who determines whether a person is an accomplice must depend upon the particular facts of each case. *Bethany v. State,* 565 S.W.2d 900, 903 (Tenn.Crim.App.1978), *cert. denied* May 1, 1978.

■■■ The trial court determined from clear and undisputed facts that "T." did not participate in the crime as an accomplice. We are in accord with this determination and therefore find that the trial judge did not err in refusing to instruct the jury as to the law of accomplice-corroboration.

Moreover, the requested charge tendered by the defendant with respect to corroboration of an accomplice's testimony was neither complete nor accurate. The trial judge correctly declined to include it as part of the instructions to the jury.

This issue is overruled.

In conclusion, we have determined that the admission of Dr. Brietstein's testimony constitutes reversible error.

Accordingly, the judgment of conviction is reversed, and the case is remanded for a new trial.

WADE, J., concurs.

DAUGHTREY, dissents with opinion.

DAUGHTREY, Judge, dissenting.

In reviewing the admissibility of expert psychological testimony in a case involving child sex abuse, this court must consider some of the most perplexing questions facing the criminal justice system today. We also address an issue about which there is little uniformity of opinion by the courts around the country.[1]

Although analysis of the problem escalates rapidly into a state of juridicial complexity, it begins on rather mundane territory with two well-established principles: first, that a trial court has broad discretion to admit or exclude expert testimony and, second, that the decision to allow such evi-

---

1. Cases cited by the state in which courts have allowed expert testimony concerning the effects of sex abuse in child victims include *Poyner v. State,* 288 Ark. 402, 705 S.W.2d 882 (1986); *State v. Kim,* 64 Haw. 598, 645 P.2d 1330 (1982); *State v. Snapp,* 110 Idaho 269, 715 P.2d 939 (1986); *Commonwealth v. Lewandowski,* 22 Mass.App. 148, 491 N.E.2d 670 (1986); *State v. Myers,* 359 N.W.2d 604 (Minn.1984); *State v. Middleton,* 294 Or. 427, 657 P.2d 1215 (1983). *See also Matter of Rinesmith,* 144 Mich.App. 475, 376 N.W.2d 139 (Mich.App.1985) (use of anatomical dolls).

Cases to the contrary cited by the defendant include *In re Sarah M.,* 194 Cal.App.3d 585, 239 Cal.Rptr. 605 (1987); *State v. Lawrence,* 112 Idaho 149, 730 P.2d 1069 (App.1986); *State v. Maule,* 35 Wash.App. 287, 667 P.2d 96 (1983). These cases turn largely on the court's perception that the "child sex abuse trauma syndrome," like the "battered wife syndrome," is a "scientific test" not yet recognized by the American Psychological Association and therefore inadmissible under *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). The state argues in response that the *Frye* test has never been adopted in Tennessee. *See also Commonwealth v. Emge,* 381 Pa.Super. 139, 553 A.2d 74 (1988) (testimony comparing behavior to that of known victims constitutes improper bolstering).

dence cannot be disturbed on appeal unless there is a clear showing that the trial court has abused its discretion. *State v. Rhoden,* 739 S.W.2d 6, 13 (Tenn.Crim.App. 1987). The trial court's discretion is not absolute, of course, and cannot be exercised as a matter of whim or caprice. Instead, the admissibility of expert testimony must be determined under an equally well-known standard—whether the evidence "will assist the trier of fact to understand the evidence or to determine a fact in issue...." Federal Rule of Evidence 702. *See also* proposed Tennessee Rule of Evidence 702 ("substantially assist"); *see also City of Columbia v. C.F.W. Constr. Co.,* 557 S.W.2d 734, 742 (Tenn.1977).

Keeping these principles in mind—that the trial court has broad discretion to admit expert testimony based upon the facts presented in the case and that the court must determine whether, under the facts presented, the proffered testimony will assist the jury—I reach a different conclusion on the admissibility of the expert testimony in this case from that of my colleagues. After much analysis, ostensibly under *State v. Williams,* 657 S.W.2d 405 (Tenn. 1983), a case involving the admissibility of a laboratory expert's testimony regarding hair comparison, the majority here has determined finally that the evidence in question was erroneously admitted because its prejudicial effect outweighed its probative value, even though the majority concedes that the expert's testimony "was of immeasurable probative value." I agree with this characterization of the usefulness of Dr. Brietstein's testimony. Because of its high degree of usefulness to the jury, and because it did not involve matters which some courts have found to be inherently unreliable, I conclude that the trial judge did not abuse his discretion in permitting Dr. Breitstein to testify.

In deciding whether the testimony in question meets the standard of proposed Tennessee Rule of Evidence 702, *i.e.,* whether it will substantially assist the jury in determining a question of fact, it is first necessary to identify the "question of fact" involved here. In the context of this case, that issue was whether or not certain incidents of sexual molestation had actually occurred.[2] It was the state's theory that they had taken place and the defendant's contrary theory that they had not. Because there was no physical evidence available; because there had been a lapse of time between the events and the child's first report; and because there was only one witness, a child who heard but did not see some kind of contact between the victim and the defendant, the case resolved itself into a classic "swearing contest," pitting the testimony of the prosecuting witness against that of the defendant. It is important to note that while not all child abuse cases would thus resolve themselves into the single issue of credibility, this one in fact did. In simplest terms, what we have before us is a young child, five years old, who says that the defendant committed a sexual assault against him, and the defendant, a 49–year–old adult, who says in response that the child is lying and "making it up."

For many years, conventional wisdom assumed that a child who made such an accusation was, indeed, "making it up." The psychologists attributed reports of molestation to sexual fantasy, and the law engaged in a presumption that children who voiced such accusations were unworthy of belief.[3] Freud, for example, ultimately discounted reports made by sexually abused children on the ground that the men so accused, many of them respected members of late Victorian society, simply could not have been guilty of the sexual advances reported by the children, principally their own daughters. *See generally* J. Masson, The Assault on Truth (N.Y.1984). Likewise,

---

**2.** The rubric that an expert cannot offer opinion testimony touching on the ultimate jury question has long since been laid to rest. *City of Columbia v. C.F.W. Constr. Co.,* 557 S.W.2d 734, 742 (Tenn.1977); proposed Tennessee Rule of Evidence 704.

**3.** A recent study shows, in fact, that less than two percent of reports of sexual abuse made by children were fictitious. *State v. Myers,* 382 N.W.2d 91, 100 (Iowa 1986) (Harris, J., dissenting).

Wigmore's mistrust is reflected in his admonition that "female complainants," particularly young girls, are highly unreliable witnesses and that their testimony should be subject to special rules obviously intended to discredit them. 3A J. Wigmore, Evidence in Trials at Common Law § 924a (rev. ed. 1970).

In addition to the medical and legal assumptions that children merely fantasize about sexual assault, rather than experience it directly, prosecution of child sex abuse cases has long been fraught with other difficulties: the general tendency of juries to believe an adult witness in preference to a child witness, the inability of a small child to articulate the facts when called as a witness in court, the likelihood that the child would be improperly influenced by an adult to recant, the lack of corroborating medical evidence, and the lack of eyewitness testimony. All these factors combine, to one degree or another, to make successful prosecution so daunting that for many years complaints of child sex abuse were either not reported or, if reported, were not pursued through the criminal justice system.

Only a naif would interpret the dramatic increase in child sex abuse prosecutions around the country in the last decade to mean that child sex abuse is a recent phenomenon. Instead, it seems apparent that the increase reflects a growing consensus that children who report sex abuse are not "making it up." Given our concern for fundamental notions of due process in the prosecution of criminal defendants, however, we seem to be groping rather awkwardly for ways in which to handle these cases in court that will protect the child victim from what amounts to added psychological abuse, while still protecting the constitutional and statutory rights of the accused. We are not, in all cases, doing a very good job. *See, e.g., Coy v. State,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

Onto this stage steps Dr. Abraham Breitstein, a clinical psychologist whose practice is devoted primarily to the evaluation and treatment of children, especially those who are the victims of sex abuse. Dr. Breitstein interviewed the child in this case and administered at least two psychological tests that led him to conclude that the child had not suffered extreme emotional disturbance. But it was not necessarily the arcane results of these tests that led to the disputed testimony here. Instead, Dr. Breitstein identified various characteristics that he had found in his experience to be common to victims of child sexual abuse. These included (1) consistency between the description given in the interview and what the child had previously reported, (2) the ability of the child to provide explicit detail that could only have been learned by experience, (3) the use of language appropriate to a child in describing that experience, (4) corroboration of the details given by the child, (5) a reported emphasis by the perpetrator on secrecy, (6) the occurrence of multiple incidence over time, (7) consistency between the extent of the abuse and the level of trauma exhibited by the child, (8) the child's ability to demonstrate what occurred using anatomically correct dolls, and (9) the presence of anger or fear on the part of the child toward the perpetrator of the abuse. Dr. Breitstein analogized these characteristics of child sex abuse to the symptoms of a cold, saying that "if a child is referred to a physician with symptoms of a cold and the child presents certain symptoms to the physician, the physician more often than not is going to say that the child has a cold or a virus, because the child is exhibiting those symptoms."

Moreover, the "symptoms" of child abuse described by Dr. Breitstein appear, upon close analysis, to be thoroughly sensible and pragmatic in nature, and not subject to ready misinterpretation. They thus stand in contrast to nonspecific "symptoms" of child abuse relied upon by experts in other cases, such as nightmares, crying spells, bedwetting, difficulty in school, weight loss, unstable family relationships, general anxiety, and the like, which obviously could be the result of emotional trauma caused by problems other than child sex abuse. To link these symptoms with child abuse, even in the case of a young and therefore inarticulate child, might in-

deed mislead a jury. Likewise, to allow the results of psychological tests to bolster the testimony of older children, otherwise capable of testifying successfully in court and conveying their experience in an understandable way to the trier of fact, might also be misleading to a jury. But to permit a trained expert who has evaluated a substantial number of similar cases involving known abuse of small children to describe common, case-specific characteristics of those abused children and compare them to the characteristics displayed by the child in question, seems to me to be of obvious benefit to a jury, especially in a case where the child is not capable of comprehensible testimony. The alternative is to give the jury no helpful information at all, thereby causing an inability to prosecute such cases, a situation which will only encourage the continued victimization of the small and the helpless. Freud and Wigmore might applaud such a result; we should not.

Of course, there must be careful limits placed on the ability to admit such testimony. In assessing its potential helpfulness to the jury, the trial judge should consider, for example, the age and testimonial capacity of the child involved and the case-specific nature of the expert's testimony. The defendant should have an opportunity to rebut expert testimony by the state, if necessary by calling expert witnesses of his own whose testimony is inconsistent with that of the state's experts. Hard and fast rules are no more helpful in this area than they are generally with expert testimony, however, and the exercise of discretion by the trial court should continue to be recognized as the controlling standard.[4]

I conclude that the trial court's ruling in this case should have been upheld. Dr. Breitstein's testimony was really no different from that we see offered routinely by psychological experts, who, for example, observe the characteristics or "symptoms" of a mental patient, compare them to others in their experience, and decide whether or not the patient is delusional and there-

fore insane. In some cases, these experts are also called upon to determine whether or not a mental patient is faking or "malingering." *See, e.g., State v. Clayton,* 656 S.W.2d 344, 349 (Tenn.1983); *State v. Green,* 643 S.W.2d 902, 909, 911 (Tenn. Crim.App.1982). When this occurs, the analogy to the situation before us is particularly apt: the question in both instances is whether or not the patient is "making it up." If the expert's opinion is helpful to the jury in the case of a suspected malingerer, it is equally valuable—and admissible—when the claim is made that a young child is "making up" reports of sex abuse.

For the reasons set out above, I would hold that the trial judge did not abuse his discretion in permitting Dr. Breitstein to testify, and I would therefore affirm the judgment of conviction.

---

**4.** *Accord, Anderson v. State,* 749 P.2d 369, 373 (Alaska App.1988) ("difficult, and perhaps improper, to formulate a single rule to cover all such cases"); *State v. Kim,* 64 Haw. 598, 645 P.2d 1330, 1334, 1337 (1982) ("expert testimony respecting witness credibility not appropriate to all situations.").