671 So.2d 807 (1996)
Richard BEAULIEU, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 95-605.
District Court of Appeal of Florida, Fifth District.
March 15, 1996.
Rehearing Denied April 19, 1996.
William F. Jung, of Black & Jung, P.A., Tampa, for Appellant/Cross-Appellee.
Robert A. Butterworth, Attorney General, Tallahassee, and Steven J. Guardiano, Sr. *808 Assistant Attorney General, Daytona Beach, for Appellee/Cross-Appellant.
HARRIS, Judge.
Richard Beaulieu was charged with and convicted of various sex acts against a minor. The incidents occurred during a one-month period while Sunni Beaulieu (the minor's natural mother) and Richard Beaulieu (the minor's stepfather) were living together in Orlando, Florida.
According to the child's natural father, he and Sunni were married in 1983 and their son was born in 1984.[1] After they divorced, Sunni had primary custody of the son until 1992. It was during this period that she met and married Beaulieu. After living with his mother and Beaulieu for a period of time, the boy moved to his father's home in 1992. Shortly thereafter he told his father that Beaulieu had sexually abused him. His stepmother, Elizabeth, testified that the boy's emotional state during his disclosure indicated that he was scared; he was trembling, crying and appeared to be in a lot of pain. He told both his father and his stepmother that it was "Rick" who abused him. The father and stepmother then spoke with a school counselor and contacted the police.
Sunni Beaulieu testified that she was unaware of any sexual abuse by Beaulieu and that in 1989 or 1990 her cousin, Douglas Diaz, resided with the Beaulieus but was asked to leave because of his drinking. Diaz had also been treated for drug addiction and had severe emotional problems. Beaulieu contends that if any sexual abuse occurred, it was committed by Diaz.
The only evidence in this case which indicated abuse was the boy's testimony, corroborated by his own hearsay statements to others and by expert opinion indicating that he fit the child abuse profile. The boy's testimony was, of course, disputed by Beaulieu's testimony. Beaulieu contends that the testimony offered by the state's expert witness was simply "psycho vouching" for the credibility of the minor child victim and, in any event, failed the stringent admissibility test outlined in Frye v. United States, 293 F. 1013 (D.C.Cir.1923). The state responds that the psychological evaluation was based on background interviews, records, two clinical interviews, and at least four separate tests and is admissible under the relevancy standard adopted by sections 90.702 and 90.703, Florida Statutes, as well as under Glendening v. State, 536 So.2d 212 (Fla.1988), cert denied, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). The issue before us is whether, under current law, a psychologist may properly testify that the symptoms he observed in evaluating an alleged sexual abuse victim are consistent with symptoms of children who have suffered sexual abuse.[2]
It is indeed deja vu all over again. We are faced with the same prosecutor, the same psychologist, similar testimony, the same appellate issue and substantially the same state of the law that perplexed this court in Toro v. State, 642 So.2d 78 (Fla. 5th DCA 1994). Little has changed since Judge Griffin's analysis of the Florida law on syndrome evidence. As we did in Toro, we affirm the conviction herein.
The psychologist in our case was permitted to testify that her evaluation of the victim indicated that he met the profile of one who had been sexually abused. In its discussion of the problem, the Toro court concluded that such testimony, under then existing law, appeared to be admissible.
Before proceeding further, we wish to correct what appears to be a misapprehension of this court's earlier opinion in Toro. The Toro court did not approve the use of child abuse syndrome expert testimony to prove sexual abuse of the alleged victim. As noted in the opinion, the Toro trial took place before the Florida Supreme Court decided *809 Flanagan.[3] In Toro there had been no objection raised at trial as to the admissibility of the expert's testimony on the basis of its reliability. The only objection ever raised in Toro was that the expert's testimony was beyond the scope of an earlier proffer, and it was that objection which we held did not warrant reversal.
As explained in Toro, it is the supreme court's decision in Flanagan v. State, 625 So.2d 827 (Fla.1993), that appears to have undone the relevancy test of Kruse v. State, 483 So.2d 1383 (Fla. 4th DCA 1986), on which the later decisions approving the use of such expert testimony was based. Judge Griffin's analysis attempted to show that the supreme court's decision in Flanagan permits, and perhaps even requires that the issue of reliability of this type of testimony be reexamined. The purpose of our lengthy discussion in Toro was to encourage a proper reexamination to be done at the trial court level at the earliest possible time in order to resolve, under Frye, whether this type of testimony any longer has any place in the courts of our state. Judge Griffin did point out the reference in State v. Townsend, 635 So.2d 949 (Fla.1994), to Glendening, but never implied that this reference was designed to carve out a unique exception to the Frye test of scientific reliability reaffirmed in Flanagan for this type of testimony, the reliability of which has come under increasingly broad and persuasive attack.
Toro did point out, however, the apparent inconsistency between Flanagan, which held that "profile" evidence is inadmissible because it does not meet the Frye test, and Townsend where, apparently relying on the "relevance" standard (section 90.702, Florida Statutes), the court stated that "if relevant, a medical expert witness may testify as to whether, in the expert's opinion, the behavior of a child is consistent with the behavior of a child who has been sexually abused." Townsend at 958.
In the very recent case of Hadden v. State, 670 So.2d 77 (Fla. 1st DCA 1996), the majority attempts to harmonize these cases by suggesting that Flanagan dealt only with a "new and novel" scientific profile (pedophile/child sex offender profile) which requires a Frye analysis whereas Townsend recognized that the specific type of evidence at issue in Hadden (and in this case) had been held admissible by a number of cases beginning with Ward v. State, 519 So.2d 1082 (Fla. 1st DCA 1988), and that therefore the issue relating to the child abuse syndrome was no longer "new or novel." We agree, however, with the dissent in Hadden that regardless of whether evidence of the child abuse syndrome has been received in evidence in various cases under the more relaxed relevancy standard, it remains a new and novel science until subjected to a Frye analysis. The only question is whether the supreme court is of the view that the child sexual abuse syndrome need not be subjected to a Frye analysis. Because Flanagan did not mention Ward or Kruse, Townsend did not mention Flanagan, and Ramirez v. State,[4] 651 So.2d 1164 (Fla.1995), did not mention Townsend, who can tell?
Because of Townsend, even after Ramirez, we are unsure as to whether the supreme court has determined that the child abuse syndrome has become, by repeated application, so well established that no further evidence of its reliability need ever be produced. Whether we describe the statement regarding profile evidence in Townsend as its holding (as did the majority in Hadden), or as dictum (as indicated by the Hadden dissent), the statement is so directly on point that we cannot ignore it.
Even though we affirm because of Townsend, we join with the court in Hadden in its certification of the issue to the supreme court. We add the following analysis to supplement our Toro opinion and the dissent in *810 Hadden merely to expand the discussion and hopefully assist in further deliberations.
The "factors" that led to (or at least contributed to) the psychologist's opinion in our case that the boy met the child abuse profile were that he was significantly attached to his father and believed his mother was not protecting him; he had a feeling of helplessness and low self-esteem; and he had difficulty in dealing with emotionally charged situations. And here is how the psychologist determined these factors from the "house-tree-person" test in which the psychologist analyzes a child's drawings:
A. The themes that emerged were the perception of a significant attachment to his father. His father was seen as the primary nurturer and protective figure, where mother was less available to him and protecting.
He had a feeling of helplessness and saw himself as different than others; meaning, again, he had low self-esteem and low self-confidence, which related to victimization or he had been damaged.
He had difficulty dealing with emotionally charged situations, which is not uncommon with children who have been victimized. They don't see their environment as safe. So they become hypervigilant to the things going on around them. When that happens, they can't go along being a child. They are too worried about what's going on in their environment.
Q. Now you get all this from viewing the pictures that he draws; is that how it works?
A. Yes, sir.
Q. What type of things did [the boy] draw that led you to make those observations?
A. Some of the most notable things in drawings like that are particularly small pictures, small human figures. If you just use your common sense and think about when somebody asks you to draw a person, you make it in the center of the page and make it about half the size of the page.
[The boy's] picture was very small as compared to other people. He used a lot of shading, not well thought out drawing shadings, but confused shadings. That's often a sign of anxiety.
[His tree] was what we call barren. It was a nice full tree, but it didn't have a root system. It gave the appearance as barren.
As far as parents doing something, there were only heads in the picture. He left off the bodies. Often when children leave off their bodies or other bodies, it's a sense of being out of control or somehow being damaged or victimized.
This testimony supports the dissents' view in Hadden that in syndrome cases, it is extremely difficult for an expert to base an opinion merely on experience unconnected with diagnostic standards not subjected to the Frye test. We also agree with the Hadden dissent that the child abuse syndrome probably would not pass a Frye test. The Tennessee Court of Criminal Appeals, while ruling that child abuse syndrome evidence is inadmissible under its version of section 90.702, Florida Statutes,[5] compiled a list of questions asked within the psychological/psychiatric community regarding the validity of such profile:
1. If there is a control group, what criteria is used to determine whether a child in that group has been, in fact, sexually abused?

*811 2. Do children react in similar ways to sexual abuse?
3. Do older children react differently to sexual abuse than do younger children?
4. Is there a typical reaction, or a typical set of reactions manifested by child victims of sexual abuse?
5. Must a child victim react typically to be believed?
6. Was the syndrome developed on the assumption that the children studied were in fact molested?
7. Can the syndrome, developed as a therapeutic aid, be used as a truth-seeking device?
8. Is the syndrome described in DMS III?
9. Is the symptomology, when described by different experts and manifested by different victims, precise?
10. Have the symptoms of those children known to be sexually abused been compared to those of children known not to have been sexually abused?
11. Do reactions of children to sexual abuse vary according to the child's relationship to the perpetrator?
12. Is there agreement in the community as to which combinations of symptoms comprise the syndrome? How many? Which ones?
At some point, it is urged, these questions should be answered.
While refusing to admit child sexual abuse syndrome evidence as substantive proof that child abuse has occurred, the Supreme Court of Indiana approves such evidence in limited situations:
It is important to recognize that syndrome evidence is not similarly problematic in all situations. The reliability of syndrome evidence, although highly questionable for purposes of affirmatively proving sexual abuse, is generally accepted for purposes of helping the jury to understand that a complainant's reactions are not atypical of a young sexual assault victim. As the Myers article notes:
The accommodation syndrome has a place in the courtroom. The syndrome helps explain why many sexually abused children delay reporting their abuse, and why many children recant allegations of abuse and deny that anything occurred. If use of the syndrome is confined to these rehabilitative functions, the confusion clears, and the accommodation syndrome serves a useful forensic purpose.
Steward v. State, 652 N.E.2d 490, 495 (Ind. 1995).
The manner in which the Indiana court uses evidence of the child abuse syndrome is, of course, precisely how we currently handle evidence of prior consistent statements. Such consistent statements may only be used to rebut an express or implied charge against the declarant of improper influence, motive or recent fabrication. See section 90.801(2)(b), Fla.Stat. Most often, the psychologist's finding of the child abuse syndrome is based primarily on the statements made by the child which are then consistent with his testimony in court. The Indiana position seems to be a reasonable and fair way to use this evidence.
We affirm the conviction but certify the following question to the supreme court as one of great public importance:
IN VIEW OF THE SUPREME COURT HOLDING IN TOWNSEND V. STATE, DOES FLANAGAN V. STATE, REQUIRE APPLICATION OF THE FRYE STANDARD OF ADMISSIBILITY TO TESTIMONY BY A QUALIFIED PSYCHOLOGIST THAT THE ALLEGED VICTIM IN A CHILD SEX ABUSE CASE EXHIBITS SYMPTOMS CONSISTENT WITH THOSE OF A CHILD WHO HAS BEEN SEXUALLY ABUSED?
AFFIRMED.
W. SHARP and ANTOON, JJ., concur.
NOTES
[1] The boy was eight years old at the time of the alleged abuse and ten years old at the time of trial.
[2] The other issues on appeal were not preserved and, standing alone or in concert with each other, do not constitute fundamental error. However, if taken together with the inadmissible profile evidence (if the supreme court determines that it is inadmissible) such issues together with the admission of the profile evidence could rise to the level of fundamental error.
[3] The Toro trial was conducted in April, 1993; the Flanagan opinion was not released until September, 1993.
[4] Ramirez established a four-step process under section 90.702 in order to determine the admissibility of a new or novel scientific principle; one such step now requires a Frye analysis. This was not the case when Kruse permitted, under section 90.702, the admission of syndrome evidence relating to child sexual abuse.
[5] State v. Schimpf, 782 S.W.2d 186 (Tenn.Crim. App. 1989). The court held:

We think that Dr. Brietstein's testimony clearly confirmed that "T." had, in fact, been sexually abused. Our only difficulty with this is that he confirmed it for a jury deciding defendant's guilt or innocence rather than for a psychologist deciding how to treat a victim.
We find that Dr. Brietstein's testimony invaded the jury's province by offering testimony which ultimately went to credibility. Credibility of witnesses is a matter only for the jury.
Furthermore, the jurors had no need for his testimony. We daily submit to juries the question of whether unlawful sexual activity has occurred. They routinely return verdicts without the assistance of expert psychological testimony. Couched in scientific terms as it was, it could only have confused and misled them.
We conclude that this evidence does not satisfy the Williams requirement that the subject matter be proper. Its admission was error.