# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 5, 2009 Session

## STATE OF TENNESSEE v. JOHN BARLOW

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-09058     James C. Beasley, Jr., Judge**

_____

**No. W2008-01128-CCA-R3-CD  - Filed April 26, 2010**

_____

Defendant-Appellant, John Barlow, was convicted by a Shelby County Criminal Court jury of aggravated child abuse and aggravated child neglect, Class A felonies.  The trial court sentenced Barlow as a Range I, violent offender to concurrent sentences of twenty-five years for the aggravated child abuse conviction and fifteen years for the aggravated child neglect conviction, for an effective sentence of twenty-five years.  In Barlow's appeal, he argues that: (1) the evidence is insufficient to support his convictions, (2) the convictions for aggravated child abuse and aggravated child neglect violate his right against double jeopardy, (3) the trial court erred in declaring Dr. Robert Sanford and Dr. Karen Lakin as expert witnesses, (4) the trial court erred in allowing Dr. Lakin to testify that the victim suffered from an "abusive head trauma incident [that was] most probably associated with [a] bed[-]wetting episode," and (5) the State committed several incidents of prosecutorial misconduct.  We conclude that the evidence is insufficient to support Barlow's conviction for aggravated child neglect.  Accordingly, the judgment of conviction for aggravated child neglect is vacated.  However, the judgment of the trial court in all other respects is affirmed.  Because Barlow's fifteen-year sentence for his aggravated child neglect conviction was to be served concurrently with his twenty-five-year sentence for aggravated child abuse, his effective sentence is unchanged.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Dismissed in Part; Affirmed in Part

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J. C. MCLIN, JJ., joined.

William D. Massey and Lorna S. McClusky (on appeal), Michael J. Johnson and J. Mark Alston, Assistant Public Defenders (at trial), Memphis, Tennessee, for the Defendant-Appellant, John Barlow.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney

General; William L. Gibbons, District Attorney General; Amy P. Weirich and Marianne L. Bell, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

This case concerns the abuse of a two-year-old victim who sustained permanent injuries while being cared for by Barlow at his home in the early morning hours of August 3, 2005. The victim suffered a severe head injury with a skull fracture that left her with brain damage, partial paralysis on her left side, and seizures.

On November 16, 2007, a Shelby County Criminal Court jury convicted Barlow of aggravated child abuse and aggravated child neglect. On December 13, 2007, the trial court sentenced him as Range I, violent offender to an effective sentence of twenty-five years. Barlow filed his motion for judgment of acquittal, or in the alternative, motion for new trial on January 9, 2008. Barlow's trial counsel was allowed to withdraw, and new counsel was appointed. Barlow's newly appointed counsel filed an amended motion for judgment of acquittal, or in the alternative, motion for a new trial on May 12, 2008. On May 14, 2008, the trial court denied these motions. Barlow then filed a timely notice of appeal.

**Trial.** Dr. Robert Sanford testified that he was a pediatric neurosurgeon at LeBonheur Children's Hospital and a professor of neurosurgery at the University of Tennessee. After hearing no objections from the defense, the trial court declared Dr. Sanford an expert in the field of pediatric neurosurgery and in general neurosurgery. Dr. Sanford stated that he received a call during the early hours of August 3, 2005, regarding the two-year-old victim, Quinceanna Butler. The victim had suffered a severe brain injury with a skull fracture. In addition, Dr. Stanford stated that there was a thick layer of blood over the surface of the victim's brain, and her brain was extremely swollen, which can cause brain damage when the brain crushes itself within the skull. In the victim's case, a CT scan of her brain showed that the "pressures" in her brain were so high that the right side of her brain had been pushed to the left side of the brain. He also observed a bruise behind the victim's ear and a second bruise on the top of her head, which indicated the existence of two separate injuries and that the victim suffered "two blows."

During the emergency surgery, Dr. Sanford made holes in the victim's skull, took a piece of bone from that area and stored it for later, made an incision in the dura to remove the blood, and attempted to prevent the brain from trying to escape the skull at the site of the incision. He explained that the victim had been given a medication to reduce the swelling of the brain to prevent it from coming out of the skull during surgery. He explained that the

operation that he performed on the victim was "one of the few operations that speed makes a difference" because it is essential to get the scalp closed during surgery before the brain comes out. In this case, Dr. Sanford said that he was able to get the victim's scalp closed and then placed a pressure monitor to read the pressure inside her skull. She was then sent back to ICU where she was given another CT scan to ensure that they had removed all of the blood. Dr. Sanford said that in a right-handed person, the talking, thinking, and thought processes are on the left side of the brain. He stated that he wanted to reduce the swelling as much as possible so that there was no further injury to the victim's brain beyond the injury that occurred when her skull was fractured. He stated that it would be necessary to do detailed neuropsychological testing in order to determine how extensively the victim's brain was damaged. However, he stated that he "suspect[ed]" that she had "further brain damage" on the left side of her brain, known as the "thinking brain," but that this damage was "probably subtle." Dr. Sanford said that the victim now walks with a "steppy gate" and her left "hand . . . turns in a little bit" although she still "has some hand function." He noted that the victim cannot "do fine finger motion" with her left hand, which would prevent her from doing activities like playing a piano. He said that he believed that the victim's right side was normal.

Dr. Sanford said that the victim had suffered a linear skull fracture that she was not born with and that she could not have received from a fall off of a bed. He stated that "it takes a significant amount of force to fracture a two and a half year old's skull." Dr. Sanford said that skull fractures like the victim's occur when a two-year-old falls off a second floor balcony or is knocked down by a child on a bicycle. However, what distinguished the victim's case from those types of cases was the fact that victim suffered a skull fracture and an acute subdural, which requires a tremendous amount of force. He explained that an acute subdural is a blood clot that comes from a "high speed injury" like a "car wreck, motorcycle accident" or "a fall down a flight of stairs . . . where you're picking up speed and bang into something." He stated that it would have taken a very strong individual to cause an acute subdural and added that "the child has to be hit against an object, an immoveable object." Dr. Sanford stated that the victim would have exhibited symptoms immediately after the injury. He also said that the victim's CT scan did not show that the fractured skull occurred before the acute subdural. Dr. Sanford stated that if the medical resident at the hospital had not immediately prepared the victim for surgery and contacted him so quickly, then the victim's "course would have been worse" because "she would have had more swelling." However, he immediately added, "[Y]ou never know what difference it would make." When asked whether a delay in treatment could have affected the victim, Dr. Sanford stated:

> So, to answer your question, I can never tell how much difference it makes how quickly [the injured child gets medical treatment] – but the quicker the better . . . . [The victim's] pressure was sky high from the time she was seen.

-3-

So that may have been because of the delay between the time she was injured until the time she got to the hospital. That's very important [for] you to understand. Because see, we see kids get hit by the – they get hit by car. They get to LeBonheur, we get the scan, sometimes we delay, we're trying to avoid surgery, but often we will go right to surgery. The sooner we get them there – and that's why the paramedics, the intubation, and the modern system is so critical, because time in these injuries is of the essence.

Dr. Karen Lakin testified that she was a pediatrician at the University of Tennessee and LeBonheur Children's Hospital and the medical director for the child protection team at LeBonheur. She explained that there was "not currently a board certification in child abuse and neglect." However, she said, "The first year to be eligible will be in 2009 [and] at that time I will apply for certification." After hearing no objections from the defense, the trial court declared Dr. Lakin an expert in the field of pediatrics and child abuse within the area of pediatrics. Dr. Lakin testified that she was asked to consult on the victim's case because the cause of the victim's injuries was "questionable in terms of etiology." On August 3, 2005, Dr. Lakin spoke to the victim's maternal aunt, Tiffany Williams, and the aunt's boyfriend, John Barlow, together. She said that Williams and Barlow told her that the victim had been healthy prior to the morning of her admission into the hospital. Barlow told Dr. Lakin that early on the morning of August 3, 2005, he heard the victim moaning and discovered that she had wet the bed. Williams told Dr. Lakin that Barlow had been doing the primary child care for the victim and Williams' two other children. According to Williams and Barlow, all of the children had been healthy and had been playing together earlier that evening. The children went to bed at approximately midnight, and the victim had no symptoms at that time. Williams stated that she had been at home with the children on August 2, 2005, except for a period of time when she went to the grocery store that afternoon and when she took her brother to work around 2:30 a.m. the next morning. Barlow told Dr. Lakin that the victim went to bed earlier than the other two children, and when he was putting the other children to bed, Barlow "noticed that the [victim] was moaning and that she had wet on herself." Barlow said that he cleaned the victim but the victim did not awaken and "he realized that something was wrong." Barlow told Dr. Lakin that he notified Williams that something was wrong with the victim when she returned to the apartment, and "there was a discussion about whether [the victim had] an illness or [whether the victim] was sleeping." After Barlow convinced Williams that the victim needed medical attention, they gathered the children and drove to the closest fire station before driving the victim to LeBonheur.

Dr. Lakin placed significance on the bed-wetting incident:

[I]ncidents of abuse occur a lot of times when caregivers are at their greatest point of stress. And many times the things that will sort of set parents or caregivers off are crying, bedwetting accidents, children that won't go to bed. They're actually normal childhood behaviors, but they're very stressful situations. . . . And certainly, [these behaviors are] considered a red flag when you're evaluating a child and you're trying to determine how an incident occurred. . . . And certainly a stressful situation that someone may not be used to handling – and if you don't have that capacity to – or that ability to . . . deal with it, it's a . . . very stressful situation.

During the examination, Dr. Lakin noticed bruises on the victim's face, forehead, and abdominal area. She explained that it was rare for children to get bruises on their abdomens because children normally catch themselves with their hands. She added that "you may see bruises a lot of times in the abdominal area, because that's where people will grab a child, and obviously, that's not an accidental bruise." She said the victim's brain had swelled so much that "it had shifted her brain over the left and put a lot of pressure on it." She said that the victim had emergency surgery to relieve the pressure on her brain. Dr. Lakin testified that the victim's injury was "not the type of injury that you would see under accidental circumstances, unless they're known accidental circumstances. And the presentation of [the victim] being perfectly fine, and being found unresponsive with no history, is not consistent with any type of accidental injury or physiological injury or reason as well." Dr. Lakin opined, to a reasonable degree of medical certainty, that the victim suffered from "abusive head trauma." She also stated that testing showed that the victim had suffered "bilateral retinal hemorrhages" in both of her eyes, which is typically caused by "severe head trauma associated with severe shaking, and often times with impact." Dr. Lakin said that at the time of her discharge from the hospital, the victim had lost motor control on her left side, which meant that she had to learn to walk again. The victim also had seizures, secondary to the trauma that occurred. Dr. Lakin said that she did not know how this injury would affect the victim's intellectual development because "head injury patients are at much higher risk for mental retardation and developmental delay and learning problems and attention deficit disorder." She also stated that the victim had delayed speech. Dr. Lakin said that because of her injuries, the victim had to start from a two-month-old level and had to learn to eat, talk, and walk again. Dr. Lakin said that the combination of the victim's skull fracture, subdural hematoma, and her bilateral retinal hemorrhages equated to a diagnosis of "abusive head trauma." She also opined that the victim could not have suffered these injuries from falling off a couch, having an undiagnosed seizure disorder, or being hit in the head by another child with a toy, unless the child was a teenager with a large baseball bat. She explained that the victim could not have suffered such a severe head injury the day before her admission to the hospital because she would have died. When asked about the timing of the victim's injuries, Dr. Lakin stated:

My opinion is that the inciting incident was probably related to the bed[-]wetting episode and that's what was brought to our attention and even reported by the caregiver. Because of the way she presented, I believe the injury happened around the time – around that two thirty [a.m.] window of time. Two thirty or three window of time because both caregivers reported that she was fine by two thirty and then half an hour later, forty-five minutes later, she wasn't. So when we take a history what we're listening for is when was there a change in the behavior, a change in the symptomatology as to when an incident occurred. Because – particularly with such severe traumatic brain injury, the timing relationship to when a child is okay and when a child is not okay is very short. Obviously she almost didn't survive. So you cannot have that traumatic of a brain injury and lie around at home hanging out without [–] you're going to die first if you stay there long enough.

Dr. Lakin stated that her "medical opinion was and is still that [the victim] suffered from an abusive head trauma incident [that was] most probably associated with that bed[-]wetting episode."

Joseph Byers, an officer with the Memphis Police Department, testified that he was called to LeBonheur Hospital on August 3, 2005, by hospital staff regarding a two-year-old victim that had sustained injuries related to a crime. Officer Byers stated that he had to return to the hospital the following day to talk to witnesses about the cause of the victim's injuries and to take an offense report. He then turned the offense report over to the child abuse squad investigators.

Tiffany Williams, the victim's aunt, testified that she lived with Barlow, their daughter, her son, and the victim at the time of the victim's injuries in August 2005. The victim had been living with them for three months prior to her injury. Before her brain injury, the victim's only health problem was bronchitis. Williams stated that the victim was not born with any birth defects and did not have a history of seizures prior to August 2005. In addition, the victim could walk, talk, and was in the process of being potty-trained at the time of her injury. Williams stated that she was with the victim the weekend before the injury, and the victim acted normally and did not have any bruises on her body. Two days before her injury, the victim was talking, walking, and acting normally, and she did not have any bruises. On August 2, 2005, the day before the victim's injury, the victim was acting normally and playing with the other children. Williams stated that she never saw anyone strike the victim, and she never saw the victim fall prior to her injury. Williams said that around 7:30 or 8:00 p.m. on August 2, 2005, the victim was hit on her head while the children were playing a game of opening and slamming a closet door. After being hit by the door, the victim got up and began playing again. Williams told Barlow to make sure that the

children stopped playing that game since the victim had gotten hit with the door. She said that the victim went to sleep around midnight and was sleeping normally when Williams left to take her brother, Reginald Fort, to work around 2:10 to 2:15 a.m. on August 3, 2005. She stated that Barlow was the only adult in the apartment with the children at the time that she took her brother to work. When she returned to the apartment around 3:00 a.m., Barlow was awake. She said that she came into the apartment and went immediately to sleep. Barlow woke her up and said that there was something wrong with the victim because she was sleeping with her eyes open. When Williams told Barlow that she was trying to sleep, Barlow showed her that the victim was biting her tongue, which had caused it to bleed. She said that when Barlow tried to pull the victim's arms, they immediately "clenched back together," which Williams believed was indicative of the victim having a seizure. Williams said that following the injury, the victim was in the hospital two and a half to three months. After she was discharged, the victim walked "funny," and her leg, arm, and eye were "messed up," and she kept her hand "balled up." She said the victim had to do speech therapy and physical therapy and had to wear a brace when she was first learning to walk after her injury.

Reginald Fort, the victim's uncle, testified that he had spent the afternoon of August 2, 2005, at the apartment shared by Williams and Barlow and that the victim had acted normally during that time. Fort said that while he and Barlow were playing a video game that evening, Barlow's daughter, Calissa, started playing with one of the controllers from the game, and Barlow hit her with an open hand one time on her back. Fort said that Barlow hit Calissa "like [she was] a grown person," even though her disobedience "wasn't that serious." He added that even though Barlow was Calissa's father, "he didn't have to hit her that hard." Fort said that he did not observe anyone strike the victim and did not see the victim fall that afternoon or evening. When Fort and Williams left the apartment between 1:50 a.m. and 2:15 a.m. on August 3, 2005, the victim was sleeping normally. He stated that it took approximately fifteen to twenty minutes to drive from Williams' apartment to Fort's place of work.

Barlow, the Defendant-Appellant, testified that he and Tiffany Williams dated in high school and then later had a daughter, Calissa, together. He stated that the victim first began living with him, Williams, their daughter Calissa, and Williams' son, approximately three months before the victim's injury. Because Barlow had recently been laid off from his job as a cashier at an Exxon gas station, he became the primary caregiver for the children. Barlow said that he did not strike the victim and did not see anyone else strike the victim the day of the victim's injury. He stated that he left the apartment only once for approximately twenty minutes around 3:00 and 4:00 p.m. on August 2, 2005, and the victim was acting normally when he returned. Between 7:30 and 8:00 p.m., Williams left the apartment to pick up some food, and Barlow and Fort stayed behind to watch the children. Barlow said that

none of the children got hurt while Williams went to pick up the food and that the victim ate normally after Williams returned with the food. Approximately thirty minutes after dinner, Fort went to sleep, and Barlow and Williams watched the children. Barlow said that the victim went to sleep on her own around midnight and was acting normally. Fort slept until Williams woke him up for work. Barlow said that Williams left the apartment to take Fort to work around 2:00 a.m. on August 3, 2005, while Barlow put the other two children to bed next to the victim. Barlow said that as he was putting the other children to bed just after Williams and Fort left, he "heard a noise, but [he] really didn't know what it was, so [he] didn't pay no mind [sic] to it." He cut off the lights, laid on the sofa, and heard the noise again. He went over to the pallet on which the children were sleeping and heard the victim making a "humming noise like she was moaning." He pulled the victim's blanket off and saw that she had wet herself. At around 2:20 to 2:25 a.m., when he was putting a diaper on her, he noticed that the victim's "body [felt] limp, and then, right then and there, [he] instantly got scared because [he knew] she [was] supposed to have some kind of tension, even though she [was] asleep." Barlow said that Williams returned home around 2:45 a.m, and he told Williams that he thought something was wrong with the victim and that they might need to take her to the hospital. Williams said that she looked fine and that she was going to go to sleep. Barlow sat on the couch worrying and then started looking at the victim again. He noticed that she was not moving. He turned on the lights and saw that her eyes were half open, and she was biting her tongue. At around 3:15 a.m., Barlow touched the victim's mouth, and "her body locked . . . with her arms clamped to her side." He awakened Williams again, and they gathered the children and drove to the fire station before taking the victim to LeBonheur hospital. Barlow stated that the hospital was a twenty to twenty-five minute drive from their home. They arrived at the hospital at around 4:00 a.m. Barlow stated that he did not do anything to injure the victim. When asked if he knew how the victim was hurt, Barlow replied, "I have no idea. Every little scenario or information I was coming up with, everyone was telling me that that's not physically possible."

Barlow acknowledged that he did not have the other children awake and dressed so that he and Williams could drive the victim to the hospital as soon as she returned home. He also admitted that he and Williams did not immediately take the victim to the hospital as soon as Williams returned home. Barlow said that it took "maybe an hour . . . [to] convince [Williams that] we needed to take [the victim] to the hospital." Barlow claimed that the only child that received a spanking the day of the victim's injury was his daughter Calissa. Barlow acknowledged that he gave Calissa, his daughter, a "whupping" for snatching the video game controllers while Williams was in the apartment. He said he struck Calissa on the legs and on the behind "two or three times at the most."

**ANALYSIS**

-8-

**I. Sufficiency of the Evidence.** Barlow contends that the evidence was insufficient for a jury to convict him of aggravated child abuse and aggravated child neglect. Specifically, he argues that although the proof established that the victim suffered serious bodily injury, there was "ample reasonable doubt" that the victim's injuries were caused by his conduct. Barlow also argues that other than his own testimony refuting any knowing act of abuse, no evidence was presented at trial regarding his mental state at the time the victim was injured. He further asserts that the evidence that the victim's head was slammed in a door by another child, Dr. Sanford's testimony that the victim had to have been "hit against an object, an immovable object" to suffer her injuries, and the proof regarding the victim's mother's practice of not giving the children proper attention and caring more about her sleep than the victim's welfare all establish reasonable doubt that he was the individual that caused the victim's injuries. Finally, Barlow argues that there was no medical proof presented at trial to support the State's theory that his delay in seeking medical attention for the victim worsened the victim's brain injury. In response, the State contends that the evidence was sufficient to support the convictions given that the proof at trial showed that the victim was left in the sole care of Barlow at the time of her injuries, that she suffered a non-accidental brain injury, and that she received delayed medical attention because of Barlow's neglect which adversely affected her health. Finally, the State argues that although Barlow contends that the victim could have suffered her injuries from being hit on her head with a slamming door while playing with the other children, the medical evidence showed that the victim suffered a "high speed injury," and the jury could have reasonably determined that being hit with a door by a child would not have caused this type of injury.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)), perm. to appeal denied (Tenn. Nov. 13, 1990). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate

the evidence." Matthews, 805 S.W.2d at 779 (citation omitted). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The State may prove the perpetrator's identity using only circumstantial evidence. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002)). In such a case, the evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). This court has clearly identified the situations in which solely circumstantial evidence can be used to convict a defendant:

> The law is firmly established in this State that to warrant a criminal conviction upon circumstantial evidence alone, the evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that he is the one who committed the crime.

Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970), perm. to appeal denied (Tenn. Nov. 2, 1970). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613. The trier of fact decides the weight to be given to circumstantial evidence, and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1605-06). This court may not "substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact." State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). However, "'[a] verdict of a jury may not be based alone upon conjecture, guess, speculation

or a mere possibility.'" State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987) (quoting Sullivan v. State, 513 S.W.2d 152, 154 (Tenn. 1974)).

The elements of aggravated child abuse and neglect at the time of the offense in this case were as follows:

> A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment who commits the offense of child abuse as defined in § 39-15-401(a), or who commits the offense of child neglect or endangerment as defined in § 39-15-401(b) and:
>
> (1) The act of abuse or neglect results in serious bodily injury to the child; or
> (2) The act of neglect or endangerment results in serious bodily injury to the child; or
> (3) A deadly weapon, dangerous instrumentality or controlled substance is used to accomplish the act of abuse, neglect or endangerment; or
> (4) The act of abuse, neglect or endangerment was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim.

T.C.A. § 39-15-402(a) (Supp. 2005). Furthermore, "serious bodily injury" was defined as:

> (A) A substantial risk of death;
> (B) Protracted unconsciousness;
> (C) Extreme physical pain;
> (D) Protracted or obvious disfigurement;
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]

Id. § 39-11-106(a)(34) (2003) (emphasis added). At the time of the offense, the child abuse and child neglect statute provided:

> (a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that if the abused child is six (6) years of age or less, the penalty is a Class D felony.
>
> (b) Any person who knowingly abuses or neglects a child under thirteen (13) years of age so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided that if the abused or neglected child is six (6) years of age or less, the penalty is a Class E felony.

-11-

Id. § 39-15-401(a), (b) (Supp. 2005).

**A. Aggravated Child Abuse.** Barlow contends that the evidence was insufficient for a jury to convict him of aggravated child abuse. The evidence presented at trial showed that the victim suffered severe head trauma while in Barlow's sole custody and control. Fort testified that the victim was acting normally from the afternoon of August 2, 2005, until the time that he left for work between 1:50 a.m. and 2:15 a.m. on August 3, 2005. Williams testified that the victim was acting normally until she returned to the apartment around 3:00 a.m. on August 3, 2005, at which time Barlow told her that something was wrong with the victim. Barlow himself testified that he first noticed that something was wrong with the victim after Williams and Fort left the apartment shortly after 2:00 a.m. on August 3, 2005. Barlow said that he told Williams that something was wrong with the victim and that they might need to take her to the hospital when Williams returned to the apartment at 2:45 a.m. on August 3, 2005. Based on the evidence presented at trial, Barlow was the only adult present at the time of the victim's injuries.

The expert medical testimony at trial established that the victim suffered serious bodily injury. Dr. Sanford testified that when he first saw the victim that the pressures inside her brain were so high that the right side of the brain had been pushed into and had caused damage to the left side of the brain, which controls an individual's talking, thinking, and thought processes. He explained that the victim, as a result of her injuries, now walks with a "steppy gate," and her left hand turns in slightly. He said that the victim could no longer do fine finger motion on her left side. Dr. Lakin testified that at the time of the victim's discharge from the hospital, the victim had lost motor control on her left side, which meant that she had to learn to walk again. She also noted that the victim had delayed speech and seizures following her injury.

The expert medical testimony also established that the victim's injuries were not accidental. Dr. Sanford testified the victim suffered a severe brain injury with a skull fracture. He said that during his examination of the victim he observed one bruise behind the victim's ear and one bruise on the top of her head, which indicated that the victim suffered "two blows." He emphasized at trial that the victim would have shown symptoms immediately after her injury. Dr. Lakin testified that she noticed bruises on the child's face, forehead, and her abdominal area during her examination. She determined that the victim suffered from "abusive head trauma" and bleeding behind both of her eyes, which is caused by severe head trauma associated with shaking or impact. Dr. Lakin stated that her "medical opinion was and is still that [the victim] suffered from an abusive head trauma incident [that was] most probably associated with that bed[-]wetting episode." She also opined that the

-12-

victim could not have suffered such a severe head injury the day before her admission to the hospital because she would have died.

Barlow argues that the victim's injuries could have been the result of being hit on the head with the door while the children were playing. The testimony at trial showed that the victim was hit on the head while the children were playing a game at 7:30 or 8:00 p.m. on August 2, 2005. Dr. Sanford testified at trial that it takes a tremendous amount of force to fracture the skull of a two-and-a-half-year old. He also said that, in addition to a fractured skull, the victim had also suffered an acute subdural, which is a blood clot that forms as a result of "high speed injury" like a "car wreck, motorcycle accident" or "a fall down a flight of stairs." Dr. Sanford said that it takes a very strong individual to cause an acute subdural and that "the child has to be hit against . . . an immoveable object." Similarly, Dr. Lakin testified that the victim could not have suffered such a serious injury as a result of a hit from a child unless the victim had been hit by a teenager with a baseball bat. Both Dr. Sanford and Dr. Lakin testified that the victim would have immediately exhibited symptoms from her injury. Given the evidence presented at trial, it was reasonable for the jury to determine that the victim could not have received such a severe brain injury from being hit with a slamming door by another child approximately eight hours before she was admitted to the hospital.

Barlow also contends that, other than his own testimony refuting any knowing act of abuse, there was no evidence presented at trial regarding his mental state at the time the victim was injured. Citing State v. David Harold Hanson, No. E2006-00883-CCA- R3-CD, 2007 WL 2416103, at *8 (Tenn. Crim. App., at Knoxville, Aug. 27, 2007), rev'd, State v. Hanson, 279 S.W.3d 265, 267 (Tenn. 2009), Barlow argues that there was reasonable doubt that he caused the injuries to the victim because there was no evidence presented at trial regarding his mental state at the time that the victim received her injuries. In David Harold Hanson, this court held that the record contained no evidence that "the defendant knowingly, without accident, treated S.H. in a manner to cause her injuries." David Harold Hanson, 2007 WL 2416103, at *8. When the David Harold Hanson case was appealed, however, the Tennessee Supreme Court reversed the judgment of the Tennessee Court of Criminal Appeals and reinstated the defendant's conviction for aggravated child abuse. Hanson, 279 S.W.3d at 267. The court noted that all of the medical experts determined that the victim's injuries were non-accidental. Id. at 278. It further noted that the victim was in the sole custody and control of the defendant at the time of her injury and that all other individuals had been excluded as sources for the victim's injuries. Id. Ultimately, the Tennessee Supreme Court in Hanson concluded, "Under these circumstances, it is our assessment that the jury had the prerogative to infer that the Defendant acted knowingly, with an awareness of the nature of his conduct, rather than accidentally." Id. In Barlow's case, Dr. Sanford and Dr. Lakin testified that victim's injuries were not accidental. Furthermore, the evidence

established that the victim was in Barlow's sole custody and control at the time she received her injuries. Williams and Fort were excluded as sources of her injuries, and Dr. Sanford and Dr. Lakin opined that it would take an individual stronger than a child to inflict such a severe injury. Accordingly, the evidence is sufficient to support Barlow's conviction for aggravated child abuse.

**B. Aggravated Child Neglect.** Barlow also argues that there was no medical proof presented at trial to support the State's theory that his delay in seeking medical attention for the victim constituted aggravated child neglect because it worsened the victim's brain injury. It is undisputed that the victim in this case was less than six (6) years old at the time of her injury. At trial, the State presented the theory that Barlow's failure to seek prompt medical attention for the victim following her injury negatively affected her health because it allowed her brain to continue to swell within her skull, thereby causing further brain damage. The evidence at trial showed that the time period between the instant that the victim exhibited symptoms and the moment that Barlow and Williams left to drive the victim to the hospital was just over an hour to an hour and a half at the most. Both Dr. Sanford and Dr. Lakin testified generally regarding the danger of having increased pressure inside the skull due to swelling of the brain. Dr. Sanford stated that "time in these injuries is of the essence." He also stated that if the medical resident at the hospital had not immediately prepared the victim for surgery and contacted him so quickly, then the victim's "course would have been worse" because "she would have had more swelling." However, he then immediately added, "[Y]ou never know what difference it would make." In State v. Mateyko, 53 S.W.3d 666, 671-72 (Tenn. 2001), the Tennessee Supreme Court held that "before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." Furthermore, "a mere risk of harm in the neglect context is . . . insufficient." Id. at 671. Upon review of the record, the evidence presented at trial did not establish that Barlow's delay in seeking medical treatment had an "actual, deleterious effect" on the victim's health. Instead, the evidence showed that Barlow's initial act of abuse caused serious bodily injury to the victim. The State failed to prove the elements of aggravated child neglect beyond a reasonable doubt at trial. Specifically, the State failed to prove that Barlow "knowingly" neglected the victim after the initial injury, that this neglect "adversely affect[ed] the child's health and welfare[,]" and that the neglect "result[ed] in serious bodily injury" apart from the initial injury that the victim had suffered. See T.C.A. §§ 39-15-401(b); -402(a) (Supp. 2005); see also id. § 39-11-106(a)(34) (2003).

Although the State attempted to distinguish the evidence supporting the aggravated child abuse charge from the aggravated neglect charge at trial and during its closing argument, the State failed to prove each of the elements of aggravated child neglect in this

-14-

case. Therefore, we conclude that the evidence presented a trial was insufficient to prove the elements of aggravated child neglect and that the judgment of conviction for aggravated child neglect should be vacated.

**II. Double Jeopardy.** Barlow contends that his dual convictions and sentences for aggravated child abuse and aggravated child neglect violate his right against double jeopardy. Specifically, he argues that there was no evidence presented at trial that was sufficient to support his conviction for aggravated child neglect. Barlow contends that there was no medical proof offered at trial to show that Barlow's one-hour delay in getting the victim to the hospital "exacerbat[ed] the injury." In response, the State contends that Barlow's argument regarding double jeopardy is waived because he failed to include this issue is his motion for a new trial. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). However, in our view, the State's reliance on waiver is misplaced. By its explicit terms, Rule 3(e) operates as a waiver of only those issues in which a new trial is the remedy for the error. A new trial is not the remedy for a double jeopardy error; instead, a reversal of the conviction and a dismissal of the relevant charge or a merger of the two counts that violate double jeopardy are the proper remedies. See State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997) (concluding that both dismissal of the charge and merger of the same offense counts into one judgment of conviction are appropriate remedies when the convictions violate a defendant's right against double jeopardy). Nevertheless, because we have already concluded that the evidence is insufficient to support Barlow's conviction for aggravated child neglect, it is unnecessary to consider Barlow's issue regarding whether the dual convictions for aggravated child abuse and aggravated child neglect violate his right against double jeopardy.

**III. Trial Court's Declaration that Dr. Sanford and Dr. Lakin Were Expert Witnesses.** Barlow acknowledges that he failed to make a contemporaneous objection when the trial court declared that Dr. Sanford and Dr. Lakin were expert witnesses to the jury during trial and during jury instructions; however, he asserts that the trial court's actions amount to plain error. Citing United States v. Johnson, 488 F.3d 690, 697 (6th Cir. 2007), Barlow claims that the trial court improperly "cloak[ed] . . . the witnesses in question with the raiment of an expert in the presence of the jury," although he states that "[n]o issue is herein raised regarding the qualifications of either witness to provide opinions based on their specialized training and experience." In response, the State argues that Barlow waived these issues because he failed to make a contemporaneous objection. Waiver notwithstanding, the

State argues that Barlow failed to establish plain error because he failed to show that consideration of the alleged errors is "necessary to do substantial justice" pursuant to Adkisson, 899 S.W.2d at 641-42. Finally, the State argues that the "procedure for qualifying expert witnesses adopted by the Sixth Circuit [in Johnson, 488 F.3d at 697-98, and other cases] is not applicable to state court trials."

After declaring Dr. Sanford an expert in the field of pediatric neurosurgery and general neurosurgery, the court made the following comments:

> [N]ormally a witness is only allowed to testify about specific facts that they have knowledge of. When somebody's declared an expert, they can give you an opinion. Normally a witness can't generally give you an opinion.

> But in the field of an expert, if based upon their qualifications, educational background, or otherwise, they're allowed to give you an opinion about certain things.

> You're to treat that testimony and that opinion just like you would any other witness, any other piece of testimony, and you judge it by the same rules and credibility you judge any other witness, but because of his expertise, he will be allowed to give you an opinion.

After declaring Dr. Lakin an expert in the field of pediatrics and child abuse, the court made the following comments:

> [The fact that Dr. Lakin has been declared an expert] allows her to give you her opinion about certain facts. And again, you are to judge that testimony and that opinion by the same rules that you follow in judging any other witness's testimony, but she will be allowed to give you an opinion.

During the jury instructions, the court stated:

> During the trial, you heard the expert testimony of the experts in a particular field.

-16-

The rules of evidence provide that if scientific, technical or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by reason of special knowledge, skill, or experience may testify and state his or her opinions concerning such matters and give reasons for that testimony.

During the motion for a new trial hearing, the court stated that Dr. Sanford and Dr. Lakin were qualified as experts in their fields based on their credentials and that the defense was given an adequate opportunity to cross examine the witnesses regarding their fields of expertise. In determining that the trial court did not err in declaring these witnesses as experts, it added:

[T]he Court . . . make[s] a habit of explaining to the jury when I qualify an expert and I'm sure that I did in this case as well, that it simply allows them to give an opinion. That doesn't give them any – their testimony any greater weight than anybody else's. It simply allows because of their field of expertise for them to give an opinion rather than be a particular fact witness with regard to certain issues and that the jury is to weigh that opinion by the same rules and standards that they weigh other . . . witnesses.

We initially note that "[q]uestions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). Upon review, a trial court's ruling regarding expert testimony will not be overruled unless the trial court abused its discretion. Ballard, 855 S.W.2d at 562 (citing Baggett v. State, 421 S.W.2d 629, 632 (Tenn. 1967)). "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)).

We agree with the State that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a). Furthermore, because Barlow failed to raise a contemporaneous objection, he is not entitled to plenary review. Instead, we can only review this issue for plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error

-17-

that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778 (1993)). In Adkisson, this court stated that in order for an error to be considered plain:

    (a) the record must clearly establish what occurred in the trial court;

    (b) a clear and unequivocal rule of law must have been breached;

    (c) a substantial right of the accused must have been adversely affected;

    (d) the accused did not waive the issue for tactical reasons; and

    (e) consideration of the error is "necessary to do substantial justice."

899 S.W.2d at 641-42 (citations omitted). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000). Furthermore, "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642. Additionally, "rarely will plain error review extend to an evidentiary issue." State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App., at Nashville, Sep. 11, 2007) (citation omitted).

    First, Barlow argues that the trial court erred in declaring the witness was an expert in the presence of the jury. He cites Johnson, 488 F.3d at 697, for the contention that "[w]hen a court certifies that a witness is an expert, it lends a note of approval to the witness that inordinately enhances the witness's stature and detracts from the court's neutrality and detachment." Instead, the Sixth Circuit outlined the proper procedure for qualifying expert witnesses in federal court:

    "Except in ruling on an objection, the court should not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion, and counsel should not ask the court to do so." ABA Civil Trial Practice Standard 17 (Feb. 1998); see also Jones, Rosen, Wegner & Jones, Rutter Group Practice Guide: Federal Civil Trials & Evidence § 8:1548.1 (The Rutter Group 2006). Instead, the proponent of the witness should pose

qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objection, allowing the objector to pose voir dire questions to the witness's qualifications if necessary and requested. See Berry v. McDermid Transp., Inc., 2005 WL 2147946, at *4 (S.D.Ind. Aug.1, 2005) (stating that "counsel for both parties should know before trial that the court does not 'certify' or declare witnesses to be 'experts' when 'tendered' as such at trial. Instead, if there is an objection to an offered opinion, the court will consider the objection. The court's jury instructions will refer to 'opinion witnesses' rather than 'expert witnesses'"); see also Jordan v. Bishop, 2003 WL 1562747, at *2 (S.D. Ind. Feb.14, 2003). The court should then rule on the objection, "to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means." Fed. R. Evid. 103(c).

Id. at 697-98. In its brief, the State argues that reliance on Johnson and other federal cases "is misplaced and does not support necessity for plain error review in order to do substantial justice." Moreover, the State contends that "[t]he procedure for qualifying expert witnesses adopted by the Sixth Circuit [in Johnson, 488 F.3d at 697-98,] is not applicable to state court trials[,]" and "[t]he trial court did not err by failing to follow a rule of the federal courts, thus this issue is inappropriate for plain error review." We agree with the State. The trial court in this case was under no obligation to follow the procedure established by the Sixth Circuit for qualifying witnesses; therefore, Barlow is not entitled to relief on this issue.

Second, Barlow contends that the trial court gave an erroneous jury instruction regarding the admissibility of Dr. Sanford's and Dr. Lakin's testimony. The trial court gave the following instruction:

The rules of evidence provide that if scientific, technical or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by reason of special knowledge, skill, or experience may testify and state his or her opinions concerning such matters and give reasons for that testimony.

Rule 702 of the Tennessee Rules of Evidence, which governs the admissibility of expert testimony, similarly states:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

-19-

education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702 (emphasis added). We conclude that the trial court's jury instruction regarding expert testimony was sufficient under Rule 702.

In this case, the trial court declared Dr. Sanford and Dr. Lakin as expert witnesses and instructed the jury regarding the admissibility of their testimony. We conclude that Barlow failed to show the trial court abused its discretion regarding these expert witnesses. Furthermore, we conclude that Barlow failed to establish all five factors required for plain error. See Adkisson, 899 S.W.2d at 641-42. Barlow is not entitled to relief on this issue.

**IV. Dr. Lakin's Testimony that the Victim Suffered from Abusive Head Trauma which was Most Probably Related to a Bed-wetting Incident.** While Barlow acknowledges that Dr. Lakin was qualified to testify in the field of "general pediatrics," he contends that the trial court committed plain error in declaring Dr. Lakin an "expert" in the field of "child abuse." Although Barlow acknowledges that Dr. Lakin testified that no certification for a child abuse specialist was available at the time of trial, he argues that "[t]here is nothing in the education and/or the background and experience of Dr. Lakin, as reflected in the record as cited, which qualifies her to express an opinion that the defendant intentionally inflicted abusive head trauma to the child based on his having great stress over the bed[-]wetting episode." Citing State v. Schimpf, 782 S.W.2d 186, 193 (Tenn. Crim. App. 1989), superseded by statute on other grounds as stated in State v. Jeffrey Edwards Pitts, No. 01C01-9701-CC-00003, 1999 WL 144744, at *6 (Tenn. Crim. App., at Nashville, March 18, 1999), perm. to appeal denied (Tenn. Oct. 11, 1999), perm. to appeal denied (Tenn. Jan. 2, 1990), Barlow also argues that "Dr. Lakin was permitted to testify in a manner which invaded the province of the jury in determining whether the defendant committed the offenses charged." In response, the State argues that Barlow has waived this issue because he failed to raise a contemporaneous objection. In addition, the State also contends that Barlow failed to show that consideration of this issue is "necessary to do substantial justice." Finally, the State argues that "Dr. Lakin's testimony that the 'inciting incident was probably related to the bed[-]wetting episode' did not go to credibility but rather to the cause of [the victim's] injuries" and that "this testimony substantially assisted the jury."

As we previously noted, "[q]uestions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." Stevens, 78 S.W.3d at 832 (citing McDaniel, 955 S.W.2d at 263-64; Ballard, 855 S.W.2d at 562). We will not overrule a trial court's ruling regarding expert testimony unless the trial court abused its discretion. Ballard, 855 S.W.2d at 562 (citing Baggett, 421 S.W.2d at 632). Furthermore, "an appellate court should find an abuse of

discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." Shuck, 953 S.W.2d at 669 (citing Herzke, 924 S.W.2d at 661).

Here, Dr. Lakin testified that she was a pediatrician at the University of Tennessee and LeBonheur Children's Hospital and the medical director for the child protection team at LeBonheur. She explained that there was "not currently a board certification in child abuse and neglect." However, she said, "The first year to be eligible will be in 2009 [and] at that time, I will apply for certification." After hearing no objections from the defense, the trial court declared Dr. Lakin an expert in the field of pediatrics and child abuse within the area of pediatrics. Dr. Lakin then testified that the victim's injury was "not the type of injury that you would see under accidental circumstances, unless they're known accidental circumstances. And the presentation of [the victim] being perfectly fine, and being found unresponsive with no history, is not consistent with any type of accidental injury or physiological injury or reason as well." Dr. Lakin placed significance on the bed-wetting incident:

> [I]ncidents of abuse occur a lot of times when caregivers are at their greatest point of stress. And many times the things that will sort of set parents or caregivers off are crying, bedwetting accidents, children that won't go to bed. They're actually normal childhood behaviors, but they're very stressful situations. . . . And certainly, [these behaviors are] considered a red flag when you're evaluating a child and you're trying to determine how an incident occurred. . . . And certainly a stressful situation that someone may not be used to handling – and if you don't have that capacity to – or that ability to . . . deal with it, it's a . . . very stressful situation.

When asked about the timing of the victim's injuries, Dr. Lakin stated:

> My opinion is that the inciting incident was probably related to the bed[-]wetting episode and that's what was brought to our attention and even reported by the caregiver. Because of the way she presented, I believe the injury happened around the time – around that two thirty window of time. Two thirty or three window of time because both caregivers reported that she was fine by two thirty and then half an hour later, forty-five minutes later, she wasn't. So when we take a history what we're listening for is when was there a change in the behavior, a change in the symptomatology as to when an incident occurred. Because – particularly with such severe traumatic brain injury, the timing relationship to when a child is okay and when a child is not okay is very short. Obviously she almost didn't survive. So you cannot have

-21-

that traumatic of a brain injury [as that suffered by the victim] and lie around at home hanging out without [–] you're going to die first if you stay there long enough.

At the end of her testimony, Dr. Lakin concluded that her "medical opinion was and is still that [the victim] suffered from an abusive head trauma incident [that was] most probably associated with that bed[-]wetting episode."

At the motion for a new trial hearing, the court stated:

> My recollection of the nature of that testimony was that she was qualified as an expert in the field of child abuse. Not necessarily in the field of medical treatment of child abuse, what happens with brain damage, but in the entire field dealing with the parties involved, the overall sociological issues involving child abuse. That's what she does for the hospital, is my recollection, part of her field of expertise. Not just the medical treatment and recognizing certain medical things with regard to [child abuse]. But I believe . . . the gist of her testimony was that something would have triggered this, and I think possibly that was opinion testimony that maybe could have been objected to or should have been objected to. I don't know.

> But I think in light of her field of expertise, giving an opinion as to what triggered it, I think she could testify that this is a trigger that often times – I think that was the thrust of the area of questioning, this is a trigger that often times triggers reaction, sometimes in adults when dealing with and abusing children, certain traumatic and sudden episodes such as bed[-]wetting or where the children have – are going through potty training and have accidents and so forth. I think that that is the type of area that she is able to testify to in her expertise that that is one of the triggers that often times leads to forms of child abuse. And I think that was the nature in which that testimony was offered, and I think that that's proper under her qualifications.

Barlow, citing State v. Schimpf, 782 S.W.2d at 193, argues that Dr. Lakin's testimony "invaded the province of the jury in determining whether the defendant committed the offenses charged." He also contends that "[c]onsideration of this issue as plain error is necessary to do substantial justice because the jury considered what can only be called 'an expert's mere speculation' to resolve its most serious duty to determine whether the defendant was guilty of the charged offenses." In Schimpf, the expert witness concluded that the child victim in that case "conform[ed] to a pattern of child sexual abuse." Id. at 193. This court stated, "We find that [the expert's] testimony invaded the jury's province by offering testimony which ultimately went to credibility. Credibility of witnesses is a matter only for the jury." Id. at 193-94. Ultimately, the court concluded that the expert's testimony

"so substantially affected the result of the trial as to constitute reversible error." Id. at 195 (citing T.R.A.P. 36(b)). The Schimpf case is distinguishable from Barlow's case. At trial, the court, without objection from the defense, declared Dr. Lakin an expert in the field of pediatrics and child abuse. Dr. Lakin determined that the victim had suffered "abusive head trauma" and bleeding behind both of her eyes, which is caused by severe head trauma associated with shaking or impact. Dr. Lakin then stated, "My opinion is that the inciting incident was probably related to the bed [-]wetting episode and that's what was brought to our attention and even reported by the caregiver." We conclude that this opinion, based on her expertise in the area of child abuse, focused on the cause of the victim's injuries rather than Barlow's credibility. Furthermore, we conclude that unlike the expert's testimony in Schimpf, Dr. Lakin's testimony when viewed in the light of the other evidence presented at trial did not "so substantially affect[] the result of the trial as to constitute reversible error." Schimpf, 782 S.W.2d at 195.

We agree with the State that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a). First, we conclude that Barlow has waived this issue by failing to object to the trial court declaring Dr. Lakin as an expert in the field of pediatrics and child abuse and by failing to object to her stated opinion that the inciting incident was probably related to bed-wetting. Furthermore, because Barlow failed to raise a contemporaneous objection, he is not entitled to plenary review. Instead, we can only review this issue for plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." Bledsoe, 226 S.W.3d at 355 (citing Olano, 507 U.S. at 734, 113 S. Ct. at 1778). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. We additionally note that "rarely will plain error review extend to an evidentiary issue." Ricky E. Scoville, 2007 WL 2600540, at *2 (citation omitted). We conclude that Barlow failed to establish all five factors required for plain error. See Adkisson, 899 S.W.2d at 641-42. Barlow is not entitled to relief on this issue.

**V. Prosecutorial Misconduct.** Although Barlow acknowledges that he failed to make a contemporaneous objection regarding several incidents of alleged prosecutorial conduct, he asserts that these incidents "distracted and suggested to the jury that it was okay to disregard the duty to consider the law and the evidence before them and to choose to exact this vague concept of retribution from the defendant on trial." In response, the State contends

that Barlow waived these issues regarding prosecutorial misconduct by failing to raise a contemporaneous objection. In addition, the State argues that Barlow failed to prove that consideration of this issue is "necessary to do substantial justice." Moreover, the State maintains that Barlow did not even attempt to establish all five factors of plain error pursuant to Adkisson.

Prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)), perm. to appeal denied (Tenn. June 3, 1996).

**A. The State's Display of the Victim at Trial.** Barlow contends that the trial court committed plain error in allowing the State to walk the child victim within four feet of the jury, ostensibly so that Dr. Lakin could identify the child. He claims that "[t]he display of the child by the prosecutor can only reasonably be seen as a blatant appeal to the natural sympathy of the jury for this child of tender years who was so severely injured [Barlow's Brief 68]." He further argues that the trial court improperly determined at the motion for a new trial hearing that it might have given Barlow relief "if there were no issue about . . . serious bodily injury" because then Barlow's argument might have had merit "as far as invoking sympathy."

At trial, the State asked Dr. Lakin a question about the victim:

| | |
|---|---|
| [THE STATE]: | Now, doctor, . . .you saw [the victim] in the hospital on August [3,] 2005, correct? |
| [DR. LAKIN]: | Yes. |
| [THE STATE]: | Have you seen her today? |
| [DR. LAKIN]: | I did. |
| [THE STATE]: | Okay. |
| [DR. LAKIN]: | I did. |

[THE STATE]:        Judge, may I take her around the table, please?

THE COURT:        You may.

[THE STATE]:        And doctor, who is this?

[DR. LAKIN]:        That's [the victim in this case].

[THE STATE]:        Your Honor, I would pass the witness.

At the motion for new trial hearing, the court stated:

As to bringing the child in the courtroom to allow the jury to observe the injuries, and that's strictly as I recall that Dr. [Lakin] testified as to the injuries, the nature of the injuries, what the permanent damage was to this child and I think she was simply brought before the jury to allow the jury to observe the injuries[,] and they were observable. She was a small, petite child, that was brought into the courtroom. She obviously had paralysis on the left side of her body which was easily detected as you could look at her. She had a problem with her eye. Those things were observed and could be observed, frankly, in no other way that I can determine, other than bringing the child in for a view by the jury. And I do not think that it was in any way prejudicial to Mr. Barlow. It was probative for the jury to understand. The State had to prove that there was serious bodily injury and that there were obviously permanent injuries inflicted to this child as a result of the brain damage that was done[,] and I think they have a duty and an obligation to prove that to the jury. And I think to be able to display the very nature of the injuries that were inflicted is proper. And I do not think that it was improper to allow her to be seen by the jury under those circumstances. It was very brief – she walked into the courtroom. Took a few steps in front of the jury and was identified by the doctor, but the injuries were apparent and obvious[,] and I think it was proper in the manner in which it was done. She was not paraded or showcased or in any way allowed to be put on display in front of the jury to evoke any type of sympathy, in my opinion, but it was simply a means by which the State was allowed to demonstrate to the jury the injuries that were inflicted. And frankly I don't see any difference in that and allowing witnesses to display their injuries before a jury or to show the permanent injuries that they had received. In this case, this child was unable to testify[,] and I think for the jury to be able to see the extent of the injuries was proper.

As we previously noted, "[q]uestions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." Stevens, 78 S.W.3d at 832 (citing McDaniel, 955 S.W.2d at 263-64; Ballard, 855 S.W.2d at 562). We will not overrule a trial court's ruling regarding expert testimony unless the trial court abused its discretion. Ballard, 855 S.W.2d at 562 (citing Baggett, 421 S.W.2d at 632). Furthermore, "an appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." Shuck, 953 S.W.2d at 669 (citing Herzke, 924 S.W.2d at 661).

We agree with the State that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a). Furthermore, because Barlow failed to raise a contemporaneous objection, he is not entitled to plenary review. Instead, we can only review this issue for plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). Barlow failed to show that the State's display of the victim at trial detrimentally affected the jury's verdict in his case. The State's actions in this instance did not effect the outcome of the trial. Therefore, we conclude that Barlow failed to establish all five factors required for plain error. See Adkisson, 899 S.W.2d at 641-42. Barlow is not entitled to relief on this issue.

**B. The State's Comments During Closing Argument.** Barlow also contends that the trial court committed plain error by allowing the State to make statements during its closing argument, which included how "little girls" should grow up and what "they" should experience, the "duty" which "we" have "to protect our kids" with explicit reference to "every child in the Great State of Tennessee," and the fact that "people . . . don't commit such crimes in front of surveillance videos. They don't commit those crimes in crowded barrooms." He asserts that these statements were not relevant to an issue for the jury's determination and that his trial was an inappropriate place for the prosecutor to "advance her ideals and aspirations concerning the raising of 'little girls.'"

The State made the following comments during its closing argument:

> A little girl should be loved and cherished. She should grow up happy and healthy. She should be able to play with her friends and they should know that they can grow up and be whatever they want to be in life.

Little girls should not spend a month in the ICU hooked up to a respirator with a feeding tube. They should not spend another two months in the hospital recovering from an infection from a bone flap from emergency brain surgery.

Little girls should not have to relearn how to walk and eat and talk at the age of two and a half. They should not suffer from a left side partial paralysis and learn to deal with that for the rest of their lives.

They should not suffer brain injuries because their caregiver could not deal with the fact that the child wet on herself during the normal processes of potty training.

Regarding these comments, the court stated the following at the motion for new trial hearing:

[M]y recollection [of the State's argument] is that because of [the victim's] permanent injuries [the victim] will never be able to do those things that normal little girls would be able to do . . . .

. . . .

Again, I don't think that there was any objection to closing argument in this particular case, and I don't find that it was improper. . . .

The State commented during its closing argument that this was a crime that occurs in private:

[T]he laws of the State of Tennessee and the reason that this charge is so convoluted and complicated and we made all these trips to the bench and Judge Beasley has apologized to you for this, we all have a duty to protect our kids.

And when I say our kids, I mean all of ours. Every child that lives in the great State of Tennessee deserves a chance. And the law knows that little kids can't come in and testify.

And the law knows that people that shake babies to the point that they suffer retinal hemorrhages and skull fractures and their brain swells to such an extent on one side that it oozes over to the other, they don't commit those crimes in front of surveillance videos. They don't commit those crimes in crowded bar rooms.

-27-

Regarding these comments, the trial court at the motion for new trial hearing stated, "I think that the context was that this crime was a crime that's not committed in front of a lot of witnesses. I don't think that was an improper argument.

Barlow also argues that the trial court committed plain error by allowing the State to argue that the trial court "has read to you those lesser includeds [sic] . . . They don't apply to this case." He claims that this statement regarding the lesser included offenses "could only have been calculated to mislead the jury and confuse the individual jurors" and effectively told the jury "ignore those instructions."

The State made the following comments regarding the lesser included offenses during closing argument:

> Judge Beasley has read you many, many pages of the law, the lesser included [offenses] of this case. But it's all or nothing, ladies and gentlemen. Judge Beasley has to read you those lesser includeds of simple child abuse and neglect, or aggravated assault and all of these other crimes in the State of Tennessee.
>
> They don't apply to this case, ladies and gentlemen, if you read them, they may sound like they do, the words are similar, the words are interchanged in the charges, but all of those lessers are swallowed up by the greater charge.

Regarding these comments, the trial court stated at the motion for new trial hearing:

> As to the State's comments about considering or not considering lesser included offenses, I think I hear that quite frequently and I think that there's – the State has the right to argue. I think lesser included offenses is obviously an issue that will go on and be greatly debated forever and ever as to the role they play and what should and should not charge. And you know, I think that sometimes it is in my humble opinion sort of strange to charge. . . .
>
> . . . I think . . . the State has a right to say . . . the law requires that these lesser included [offenses] be charged, but this is not one of those lesser includeds. It's the same argument, I would think in reverse that the defense has a right to say the law – [the State has] accused this person of a higher crime, but that's not what this is. That's not applicable in this case, it's a lesser crime. I think to the same extent, the same argument's being made and I think that those are particularly arguments where both sides are arguing for their particular – the way they view the evidence and I think to say I don't

-28-

think this applies. I think this applies is just argument. And I tell the jury that they're not to consider what the lawyers say is law. They're to follow the law that I give them and I specifically told them in my original instructions and in my subsequent instructions that they had to consider all of those offenses, notwithstanding what either the State or the defense argued.

So I don't find any merit in that particular ground.

The courts of this state have routinely noted that "closing argument is a valuable privilege that should not be unduly restricted." Bane, 57 S.W.3d at 425 (citation omitted). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. Id. However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)), perm. to appeal denied (Tenn. April 7, 2008). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper as to negatively affect the verdict: (1) "[t]he conduct complained of viewed in context and in light of the facts and circumstances of the case"; (2) "[t]he curative measures undertaken by the court and the prosecution"; (3) "[t]he intent of the prosecutor in making the improper arguments"; (4) "[t]he cumulative effect of the improper conduct and any other errors in the record"; and (5) "[t]he relative strength and weakness of the case." Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

We agree with the State that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a). Furthermore, because Barlow failed to raise a contemporaneous objection, he is not entitled to plenary review. Instead, we can only review this issue for plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). Barlow failed to show that the prosecution's remarks during closing argument detrimentally affected the jury's verdict in his case. Based on the record, any incidents of alleged prosecutorial misconduct did not effect the outcome of the trial. Therefore, we conclude that Barlow failed to establish all five factors required for plain error. See Adkisson, 899 S.W.2d at 641-42. Barlow is not entitled to relief on this issue.

**CONCLUSION**

Upon review, we affirm the judgment of conviction for aggravated child abuse. However, we conclude that the evidence is insufficient to support the conviction for aggravated child neglect. Accordingly, the conviction for aggravated child neglect is reversed and dismissed. Because Barlow's fifteen-year sentence for his aggravated child neglect conviction was to be served concurrently with his twenty-five-year sentence for aggravated child abuse, his effective sentence remains unchanged.

_____
CAMILLE R. McMULLEN, JUDGE